CONVENTION CENTER REFEREN-DUM COMMITTEE, et al., Appellants,

v.

DISTRICT OF COLUMBIA BOARD OF ELECTIONS AND ETHICS, et al., Appellees.

Nos. 79–857, 79–858 and 79–885.

District of Columbia Court of Appeals.

Argued En Banc Nov. 7, 1980.

Decided Oct. 8, 1981.

William B. Schultz, Washington, D.C., with whom Diane B. Cohn and Alan B. Morrison, Washington, D.C., were on the brief, for appellants.

William Lewis, Gen. Counsel, Washington, D.C., with whom Cecily Collier, Acting Gen. Counsel at the time the briefs were filed, Washington, D.C., was on the briefs, for appellee Dist. of Columbia Bd. of Elections and Ethics.

James C. McKay, Jr., Asst. Corp. Counsel, Washington, D.C., with whom Judith W. Rogers, Corp. Counsel, Richard A. Barton, Deputy Corp. Counsel at the time the briefs were filed, and David P. Sutton, Acting Deputy Corp. Counsel, Washington, D.C., were on the briefs, for appellee Dist. of Columbia.

James H. Heller, Washington, D.C., with whom Arthur B. Spitzer, Washington, D.C., was on the brief, for amicus curiae Hilda Mason.

Stephen Truitt, Washington, D.C., with whom Deborah A. Calloway, Washington, D.C., was on the brief, for amicus curiae Betty Ann Kane.

Jerry A. Moore, III, Washington, D.C., with whom J. Kirkwood White, Washington, D.C., was on the brief, for amicus curiae Greater Washington Bd. of Trade, et al.

Before NEWMAN, Chief Judge, and KELLY, KERN, NEBEKER, HARRIS, MACK, FERREN, and PRYOR, Associate Judges, and GALLAGHER,* Associate Judge, Retired.

OUTLINE OF THE PLURALITY OPINION

|     |                     | Page |
|-----|---------------------|------|
| I.  | SUMMARY OF DECISION | 892  |
| II. | HISTORY OF THE CASES| 893  |

* Judge GALLAGHER was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on February 27, 1981.

                                                                    Page
III.  THE CCRC INITIATIVE PROPOSES A "LAW" ------------------------ 896
      A.  The Scope of the Initiative Power -------------------------- 896
      B.  The Scope of the CCRC Initiative -------------------------- 898

          1.  The Significance of the Initiative Bill Itself ----------------- 898
          2.  The CCRC Initiative --------------------------------------- 899
          3.  Postcirculation Revisions ---------------------------------- 900

      C.  The Powers of the Council --------------------------------- 902

          1.  Home Rule Powers ---------------------------------------- 903
          2.  The Budgetary Exception ---------------------------------- 904
              a.  The Budgetary Process ------------------------------- 904
              b.  Deauthorization and Defunding ---------------------- 905

      D.  A Legislative Act -------------------------------------------- 907

IV.  THE CCRC INITIATIVE PROPOSES A "LAW APPROPRIATING FUNDS" ------- 911

      A.  "Laws Appropriating Funds" ------------------------------- 911
      B.  The "Dixon Amendment" ----------------------------------- 914
      C.  The Invalidity of the CCRC Initiative ----------------------- 915

V.  CONCLUSION ----------------------------------------------------- 916

VI.  POSTSCRIPT: RESPONSE TO DISSENT ------------------------------- 916

APPENDIX A:  INITIATIVE MEASURE No. 1 ----------------------------- 919
APPENDIX B:  INITIATIVE MEASURE No. 2 ----------------------------- 920
APPENCIX C:  INITIATIVE MEASURE No. 3 ----------------------------- 920

FERREN, Associate Judge, with whom KELLY and MACK, Associate Judges, concur:

This case presents questions of exceptional importance concerning both the legislative powers of the District of Columbia Council and the related right of the electorate to adopt legislation by initiative. We conclude that the initiative submitted to the Board of Elections and Ethics (the Board) by the Convention Center Referendum Committee (CCRC) to bar construction and operation of a convention center meets the threshold requirement of the Charter Amendments, D.C.Code 1980 Supp., § 1–181(a), that an initiative propose a "law." The right of initiative, however, does not extend to all legislation the Council could enact. We further conclude that the CCRC initiative is barred by the Charter Amendments exception precluding initiatives for "laws appropriating funds," *id.*—an exception reflected in the "Dixon Amendment," *id.* § 1–1116(k)(7), to the Initiative, Referendum, and Recall Procedures Act, *id.* §§ 1–1116 to –1119.3 (Initiative Procedures Act). Accordingly, we must affirm.

## I.  SUMMARY OF DECISION

For guidance, we offer a summary of our analysis. Part II, History of the Case, describes CCRC's efforts to use the recently authorized right of initiative to halt the Convention Center project. In Part III, we address the question whether the CCRC initiative proposes a "law" and thus lies within the general scope of the initiative right granted by the Charter Amendments, D.C.Code 1980 Supp., § 1–181(a).

In particular, in Part III.A., *The Scope of the Initiative Power*, we confirm the principle that, unless the statute defining the initiative right provides otherwise, the power of the electorate to enact a "law" by "initiative" is congruent with the right of the legislature (here, the Council) to adopt "legislative" measures. Next, in Part III.B., *The Scope of the CCRC Initiative* —as a prerequisite to determining whether the initiative here is wholly legislative in character—we analyze specifically what the

electorate would accomplish. We conclude that the initiative would (1) repeal the substantive authorization for construction and operation of the Convention Center, *see* D.C.Code 1973, § 9–220(a); *id.* 1980 Supp., §§ 9–601 to –610, and (2) prohibit the expenditure of funds appropriated for construction and operation of the Center, as well as bar future budget requests for such appropriations. In Part III.C., *The Powers of the Council*, we conclude that in accordance with its powers under the Home Rule Act[1] (and subject to congressional agreement), the Council could adopt legislation having the same effect as the CCRC initiative. Finally, in Part III.D., *A Legislative Act* —in response to a central argument by the District of Columbia and the concurring opinion of *Chief Judge* NEWMAN—we explain why such action by the Council is a legislative act and would not impinge on executive functions. Accordingly, because the District Council properly could adopt legislation with the same effect as the CCRC initiative and would not thereby infringe upon the executive functions of the Mayor, we conclude in Part III that The CCRC Initiative Proposes a "Law."

In contrast with the Council, however, the electorate, by way of initiative, cannot enact every kind of law. In Part IV we conclude that the Charter Amendments exception to the initiative right precluding "laws appropriating funds," D.C.Code 1980 Supp., § 1–181(a), bars the CCRC initiative. Specifically, in Part IV.A., "*Laws Appropriating Funds*," we conclude that this exception prohibits initiatives that either would fund a project or—as is true of CCRC's initiative—would bar the expenditure of funds already requested or appropriated for

a project. Concomitantly, the exception does not bar initiatives that would authorize (but not fund) a new project, repeal authorization for a project (but not rescind its current funding), or prohibit future budget requests. In Part IV.B., *The "Dixon Amendment*," we conclude that the Initiative Procedures Act properly reflects the "laws appropriating funds" exception to the initiative right, and thus properly requires the Board and the courts to withhold from the ballot an initiative, such as CCRC's, that proposes such a law.

In summary, because the CCRC initiative would not merely have a prospective effect, but would stop the expenditure of appropriated funds, it is beyond the scope of the initiative right. It cannot reach the ballot.

## II.  HISTORY OF THE CASE

The Convention Center project first reached official status when the Mayor proposed, and the Council included in a budget amendment act for Fiscal Year 1978, a request to Congress for an initial capital outlay of $27 million for an estimated $98.7 million project.[2] The Council had not passed, in support of this request, a substantive law specifically authorizing construction of the Convention Center; it apparently had relied solely on the general authorization for capital construction in D.C.Code 1973, § 9–220(a).[3] Congress appropriated the $27 million in June 1978.[4]

In the meantime, the Charter Amendments Act granting District electors the rights of initiative, referendum, and recall had become effective on March 10, 1978.

1. District of Columbia Self-Government and Governmental Reorganization Act, Pub. L. No. 93–198, 87 Stat. 774 (1973) (codified in scattered sections of D.C.Code 1978 Supp.), *as amended* (commonly known as the Home Rule Act).

2. *See* Fiscal Year 1978 Budget Amendment Act, Act 2–36, tit. II, § 201, 23 D.C. Reg. 9699 (1977); District of Columbia Government, Budget Amendment Fiscal Year 1978, at CAP–1 to –5 (May 1977).

3. D.C.Code 1973, § 9–220(a) provides:

> A program of construction to meet capital needs of the government of the District of Columbia is hereby authorized. Such program shall include, without limitation, projects relating to activities to meet the needs of the public in the fields of education, health, welfare, public safety, recreation, and other general government activities.

4. *See* District of Columbia Appropriations Act, 1978, Pub. L. No. 95–228, tit. II, 92 Stat. 281 (D.C. Appropriations Act, 1978).

*See* D.C.Code 1980 Supp., §§ 1–181 to –195.[5] That Act required the Council to pass implementing legislation by September 6, 1978. *See id.* § 1–187. The Council failed to meet this deadline. *Convention Center Referendum Committee v. Board of Elections & Ethics*, D.C.App., 399 A.2d 550, 551 (1979) (*Convention Center I*).

Nonetheless, in an effort to halt the movement toward a Convention Center, CCRC submitted its first initiative to the Board of Elections and Ethics in October 1978. *See id.* The Board refused to accept the bill in the absence of implementing legislation. *Id.* CCRC filed suit in Superior Court in December 1978, seeking a declaration that the Charter Amendments are self-executing. *Id.* On February 28, 1979, this court held that they are not. *See id.* at 552–53.

On June 7, 1979, the Council's implementing legislation, the Initiative Procedures Act, went into effect. That Act exempted CCRC from certain procedural requirements, in order to allow CCRC to proceed without having to collect new signatures in support of its initiative. *See* D.C.Code 1980 Supp., § 1–1119.2. The Act also included the "Dixon Amendment," which provided that the Board must refuse to accept any measure that is not a "proper subject for initiative" because (among other reasons) "the petition presented would negate or limit an act of the Council of the District of Columbia pursuant to [D.C.Code 1978 Supp.,] section 47–224," which governs the budgetary process. D.C.Code 1980 Supp., § 1–1116(k)(7).[6]

Following enactment of this implementing legislation, on June 13, 1979, CCRC made a second submission to the Board, presenting a proposed bill, a proposed short title, and petitions bearing a summary statement of the initiative bill and approximately 15,000 signatures.[7] (This bill is reproduced in Appendix A and will be referred to as Initiative Measure No. 1.) On July 11, 1979, the Board again rejected the petitions, this time on the ground that the proposed bill intruded upon the budgetary process and thus presented an improper subject for an initiative by virtue of the "Dixon Amendment."

5. The District Charter comprises Title IV of the Home Rule Act, *supra* note 1. Title IV includes the provisions concerning the Council, the Mayor, the Judiciary, the District Budget and Financial Management, Borrowing, and Independent Agencies. The Charter may be amended only in accordance with the procedure specified in D.C.Code 1978 Supp., §§ 1–124, –125, –128(a).

6. D.C.Code 1980 Supp., § 1–1116(k) provides:

Upon submission of an initiative or referendum petition by the proposer to the Board of Elections and Ethics, the Board shall refuse to accept the petition if the Board finds that the measure presented is not a proper subject for initiative or referendum, whichever is applicable, under the terms of title IV of the District of Columbia Self-Government and Governmental Reorganization Act, as amended, or upon any of the following grounds:

(1) the verified statement of contributions has not been filed pursuant to sections 1–1134 and 1–1136; or

(2) the petition is not in the proper form established in subsection (g) of this section; or

(3) the time limitation established in subsection (j) of this section within which the petition may be circulated and submitted to the Board has expired; or

(4) the petition on its face clearly bears an insufficient number of signatures; or

(5) the petition sheets do not have attached to them the statements of the circulators as provided in subsection (h) of this section; or

(6) the petition authorizes, or would have the effect of authorizing, discrimination prohibited under the Human Rights Act of 1977 (D.C.Code [1978 Supp.], sec. 6–2201 et seq.); or

(7) the petition presented would negate or limit an act of the Council of the District of Columbia pursuant to [D.C.Code 1978 Supp.] Section 47–224.

In the case of refusal to accept a petition, the Board shall endorse on the petition the words submitted but not accepted and the date, and retain the petition pending appeal. If none of the grounds for refusal exists, the Board shall accept the petition.

7. It is not clear from the record whether CCRC had submitted precisely the same material, absent only signatures, to the Board in October 1978. Approximately 12,500 verified signatures would be required to qualify the initiative for the ballot.

CCRC immediately filed suit pursuant to D.C.Code 1980 Supp., § 1–1116(*l*)[8] to challenge the Board's action, primarily on the ground that the "Dixon Amendment" went beyond the limitations on the initiative right specified in the Charter Amendments. On July 31, 1979, the trial court denied CCRC's motion for summary judgment and granted summary judgment for appellees, upholding the validity of the "Dixon Amendment" at least insofar as it prohibits an initiative "to challenge acts appropriating current capital funds." *Convention Center Referendum Committee v. Board of Elections & Ethics*, D.C.Super.Ct., Civ. No. 8368–79 (July 31, 1979) (*Convention Center II*). The court suggested in dictum that an initiative seeking only to prevent the Council from making future budget requests for capital appropriations would be valid.

Acting on this suggestion, CCRC made a third submission to the Board on August 1, 1979. It contained the same short title and summary as had the second submission on June 13; but this third package included a new bill, identical to the summary statement that appeared on the signed petitions. (This bill is reproduced in Appendix B and will be referred to as Initiative Measure No. 2.) CCRC asked the Board to construe this second bill to prevent the Council only from making future requests for Convention Center appropriations, in accordance with the *Convention Center II* dictum. On August 3, 1979, before the Board ruled, CCRC filed a third suit in Superior Court, seeking

both a declaration that its new bill was a "proper subject" for an initiative and an injunction ordering the Board to begin verifying CCRC's petition.

On August 6, 1979, CCRC made a fourth filing with the Board, presenting a third draft of a proposed short title and initiative bill. The text of this bill was identical to that of Initiative Measure No. 2 and the summary statement on the signed petitions, with the addition of a definition section explicitly limiting the bill to the dictum of *Convention Center II*. (This bill is reproduced in Appendix C and will be referred to as Initiative Measure No. 3.)

Later the same day, the Board rejected both of CCRC's requests to reinterpret its initiative to conform to *Convention Center II*. The trial court denied CCRC's motion for a preliminary injunction the same afternoon. *See Convention Center Referendum Committee v. Board of Elections & Ethics*, D.C.Super.Ct., Civ. No. 9874–79 (August 6, 1979) (*Convention Center III*). In so ruling, the trial court held that Initiative Measure No. 2, like Initiative Measure No. 1, conflicted with the Charter Amendments, as implemented by the "Dixon Amendment," and was therefore outside the scope of the initiative right. The court also declined to approve Initiative Measure No. 3. The court reasoned that to restrict the language of the initiative to future budget requests—either through judicial construction of Initiative Measure No. 2 or through

8. D.C.Code 1980 Supp., § 1–1116(*l*) provides:

If the Board of Elections and Ethics refuses to accept an initiative or referendum petition when submitted to it, the person or persons submitting such petition may apply, within ten (10) days after the Board's refusal to accept such petition, to the Superior Court of the District of Columbia for a writ in the nature of mandamus to compel the Board to accept such petition. The Superior Court shall expedite the consideration of the matter. If the Superior Court determines that the issue presented by the petition is a proper subject for initiative or referendum, whichever is applicable, under the terms of title IV of the District of Columbia Self-Government and Governmental Reorganization Act, as amended, and that the petition is legal in form and apparently meets the requirement

for signatures, both as to number and as toward distribution, prescribed in subsection (i) of this section, and was submitted within the time limitations established in subsection (j) of this section, and has attached to the petition the proper statements of the circulators prescribed in subsection (h) of this section, and does not authorize discrimination as prescribed in subsection (k)(6) of this section and would not negate or limit an act of the Council of the District of Columbia as prescribed in subsection (k)(7) of this section, it shall issue an order requiring the Board to accept the petition as of the date of submission for filing. Should the Superior Court hold in favor of the proposer, it shall award court costs and reasonable attorney's fees to the proposer.

the limiting definitions contained in Initiative Measure No. 3—would distort the fair meaning of the bill, materially change the measure circulated by petition, and mislead the voters. On August 10, 1979, ruling on cross-motions for summary judgment, the trial court denied CCRC's motion and granted summary judgment for appellees.

CCRC filed timely notices of appeal from the trial court's decisions of July 31, August 6, and August 10. *See* D.C.Code 1973, §§ 11–721(a)(1), (2)(A); D.C.App. R. 4 II(a). On appellants' motion, this court consolidated these appeals. A majority of a division of this court affirmed the judgment in favor of appellees. Believing this case presents a matter of "exceptional importance," D.C.App. R. 40(c)(2), we granted rehearing en banc.

During this litigation the Convention Center project has continued. In October 1979, in accordance with the Council's request, Congress appropriated an additional $45 million in construction funds for the Center.[9] In December 1980, Congress appropriated the final $26.7 million requested for Convention Center construction.[10] In the meantime, as of October 31, 1980, the District had obligated $71.1 million of the $98.7 million Convention Center Construction budget.

Once construction had started, the District began to make plans for operation of the Center. In 1979 the Council adopted the Washington Convention Center Management Act. D.C.Code 1980 Supp., §§ 9–601 to –610.[11] The Council has requested a budget of $1.2 million for this program for Fiscal Year 1982.[12]

## III. THE CCRC INITIATIVE PROPOSES A "LAW"

This case presents a series of questions of law. The first is whether the CCRC initiative proposes a "law" within the meaning of the Charter Amendments, D.C. Code 1980 Supp., § 1–181(a). We conclude that it does.

### A. *The Scope of the Initiative Power*

The Home Rule Act, *see* note 1 *supra*, originally contained no right of initiative, referendum, or recall. In 1978, the Charter Amendments Act, D.C. Code 1980 Supp., §§ 1–181 to –195, granted the electorate these long-recognized instruments of direct control of legislative decisions and decisionmakers. *See generally* 5 E. McQuillin, The Law of Municipal Corporations §§ 16.-48, .52–.53 (3d rev.ed. 1969 & Supp.1980).

The initiative provision enables electors, within prescribed limits, to propose "laws":

> The term "initiative" means the process by which the electors of the District of Columbia may propose laws (except laws appropriating funds) and present such proposed laws directly to the registered qualified electors of the District of Columbia for their approval or disapproval. [D.C.Code 1980 Supp., 1–181(a).]

If the voters approve an initiative measure, it becomes "an act of the Council," *id.*

---

9. *See* District of Columbia Appropriations Act, 1980, Pub. L. No. 96–93, tit. II, 93 Stat. 713 (1979) (D.C. Appropriations Act, 1980); Fiscal Year 1980 Budget Request Act, Act 2–311, 25 D.C. Reg. 6094 (1978); 1 Government of the District of Columbia, Justifications for the FY 1980 Budget, at BD–CAP–1 (Feb.1979).

10. *See* District of Columbia Appropriations Act, 1981, Pub. L. No. 96–530, 94 Stat. 3121 (1980) (D.C. Appropriations Act, 1981); Fiscal Year 1981 Budget Request Act, Act 3–134, 27 D.C. Reg. 119 (1979).

11. After declaring the public interest in having a convention center and the related necessity of granting certain powers, *see* D.C.Code 1980 Supp., § 9–601, the statute establishes "as an independent agency of the District of Columbia government, the Convention Center Board of Directors (the 'Board')." *Id.* § 9–602(a). The statute gives the Board certain powers to enable it to operate the Convention Center. *See id.* § 9–603. The statute also establishes "a 'Washington Convention Center Fund' ('the Fund') to be operated as an enterprise fund," *id.* § 9–605(a), to finance "the operation and management of the convention center." *Id.* § 9–605(b). The statute explicitly "authorize[s] to be appropriated such funds as may be necessary to carry out the purposes of this chapter." *Id.* § 9–609.

12. *See* Fiscal Year 1982 Budget Request Act, Act 3–294, 27 D.C. Reg. 5315, 5327 (1980).

§ 1–185,[13] and thus "law" through the channel designated for the particular type of act adopted. *Id.; see id.* 1978 Supp., § 1–147(c).[14]

The initiative power, therefore, is a "power of direct legislation" by the electorate. 5 E. McQuillin, *supra* § 16.49, at 200. In analyzing the scope of this right, we proceed from the widely accepted premise that, absent express or implied limitation, the power of the electorate to act by initiative is coextensive with the power of the legislature to adopt legislative measures. *E.g., Simpson v. Hite,* 36 Cal.2d 125, 129, 222 P.2d 225, 228 (1950) (en banc); *State ex rel. Frank v. Salome,* 167 Kan. 766, 774, 208 P.2d 198, 204 (1949); *Whitehead v. H & C Development Corp.,* 204 Va. 144, 149, 129

S.E.2d 691, 695 (1963); *Paget v. Logan,* 78 Wash.2d 349, 356, 474 P.2d 247, 251–52 (1970) (en banc); *Heider v. Common Council of Wauwatosa,* 37 Wis.2d 466, 474, 155 N.W.2d 17, 21 (1967). *See generally* 5 E. McQuillin, *supra* §§ 16.54–.55.

Although acceptance of this principle is virtually universal, its application is difficult. The determination whether an action is "legislative" and hence subject to initiative depends substantially on both the particular governmental structure and the initiative measure under consideration. *Whitehead, supra* 204 Va. at 150, 129 S.E.2d 695; *see* 5 E. McQuillin, *supra* §§ 16.-48–.49, .54–.57. We therefore turn to the facts of this case.[15]

13. D.C.Code 1979 Supp., § 1–185 provides:

   If a majority of the registered qualified electors voting in a referendum approve an act or adopt legislation by initiative, then the adopted initiative or the act approved by referendum shall be an act of the Council upon the certification of the vote on such initiative or act by the District of Columbia Board of Elections and Ethics, and such act shall become law subject to the provisions of section 1–147(c).

14. D.C.Code 1978 Supp., § 1–147(c) provides:

   (c)(1) Except acts of the Council which are submitted to the President in accordance with the Budget and Accounting Act, 1921 (31 U.S.C. § 1 et seq.) any act which the Council determines according to section 1–146(a), should take effect immediately because of emergency circumstances, and acts proposing amendments to title IV of this Act, the Chairman of the Council shall transmit to the Speaker of the House of Representatives, and the President of the Senate a copy of each act passed by the Council and signed by the Mayor, or vetoed by the Mayor and repassed by two-thirds of the Council present and voting (and with respect to which the President has not sustained the Mayor's veto), and every act passed by the Council and allowed to become effective by the Mayor without his signature. Except as provided in paragraph (2), no such act shall take effect until the end of the 30-day period (excluding Saturdays, Sundays, and holidays, and any day on which either House is not in session) beginning on the day such act is transmitted by the Chairman to the Speaker of the House of Representatives and the President of the Senate and then only if during such 30-day period both Houses of Congress do not adopt a concurrent resolution disapproving such act. The provisions of section 1–127, except

subsections (d), (e), and (f) of such section, shall apply with respect to any concurrent resolution disapproving any act pursuant to this paragraph.

   (2) In the case of any such act transmitted by the Chairman with respect to any Act codified in titles 22, 23, or 24, such act shall take effect at the end of the 30-day period beginning on the day such act is transmitted by the Chairman to the Speaker of the House of Representatives and the President of the Senate only if during such 30-day period one House of Congress does not adopt a resolution disapproving such act. The provisions of section 1–127 relating to an expedited procedure for consideration of resolutions, shall apply to a simple resolution disapproving such act as specified in this paragraph.

15. A careful focus on the initiative measure, as it relates to our governmental structure, is especially important because the District of Columbia is constitutionally unique. *Palmore v. United States,* 411 U.S. 389, 395, 93 S.Ct. 1670, 1675, 36 L.Ed.2d 342 (1973); *National Mutual Insurance Co. v. Tidewater Transfer Co.,* 337 U.S. 582, 588, 69 S.Ct. 1173, 1176, 93 L.Ed. 1556 (1949) (plurality opinion); *Hepburn v. Ellzey,* 6 U.S. (2 Cranch.) 445, 452, 2 L.Ed. 332 (1805). It has characteristics of a number of governmental entities. *See generally* Newman & DePuy, *Bringing Democracy to the Nation's Last Colony: The District of Columbia Self-Government Act,* 24 Am. U.L. Rev. 537, 556–69 (1975). Therefore, despite the fact that home rule for the District and the initiative right for its electors have received only limited judicial interpretation, *see District of Columbia v. Washington Home Ownership Council, Inc.,* D.C.App., 415 A.2d 1349 (1980) (en banc); *Bishop v. District of Columbia,* D.C.App., 411 A.2d 997 (en banc), *cert. denied,* 446 U.S. 966,

## B. *The Scope of the CCRC Initiative*

In order to determine whether the CCRC initiative proposes a "law," we first must define the legal scope of the CCRC initiative.

### 1. *The Significance of the Initiative Bill Itself*

■ To ascertain the scope of an initiative, the Initiative Procedures Act directs attention to the initiative bill itself. This focus is not only sensible but also necessary. Because the initiative may establish a law, it must include a bill; thus, neither the Board nor the court truly can determine whether an initiative conforms to the limitations on the initiative right unless it scrutinizes the very bill that would become law.[16]

Under the Initiative Procedures Act, the proposer of an initiative or referendum first files with the Board of Elections and Ethics "the full text of the measure, a summary statement ..., and a short title ...." D.C.Code 1980 Supp., § 1–1116(a)(1). The Board then prepares "a true and impartial summary statement, ... a short title, ....

and ... in proper legislative form, the proposed initiative or referendum measure ...." *Id.* § 1–1116(c)(1)–(3); *see id.* § 1–186. "Upon final establishment" of these three elements, *Id.* § 1–1116(g); *see id.* §§ 1–186, –1116(d)–(f), the proposer circulates petitions for signature containing "the text of the official summary and short title of the measure ...." *Id.* § 1–1116(g)(3); *see id.* §§ 1–1116(h)–(j). Apparently, however, only *after* the proposer has submitted the signed petitions to the Board does the Board make a definitive determination as to the propriety of the subject matter (in contrast with the "proper legislative form"): "[T]he Board shall refuse to accept the petition if the Board finds that the measure presented is not a proper subject for initiative or referendum, whichever is applicable," on any of the grounds specified in the statute. *Id.* § 1–1116(k); *see* note 6 *supra*.[17] Accordingly, (1) before the proposer circulates the petitions, the Board assures that the summary statement printed on the petitions accurately reflects the initiative bill, then (2) after the required number of petitions have been signed and presented, the

100 S.Ct. 2943, 64 L.Ed.2d 825 (1980); *Capitol Hill Restoration Society, Inc. v. Moore*, D.C. App., 410 A.2d 184 (1979); *Convention Center I, supra; McIntosh v. Washington*, D.C.App., 395 A.2d 749 (1978), we must be cautious, in drawing on precedent from other jurisdictions, to test it against our own special context here.

16. *See Simpson v. Hite, supra* 36 Cal.2d at 127, 222 P.2d at 226; *Teachers Management & Investment Corp. v. City of Santa Cruz*, 64 Cal. App.3d 438, 443, 134 Cal.Rptr. 523, 526–27 (1976); *Duran v. Cassidy*, 28 Cal.App.3d 574, 577–78 & n.1, 588 ex. 1, 104 Cal.Rptr. 793, 796–97 & n.1, 805 ex. 1 (1972); *Mueller v. Brown*, 221 Cal.App.2d 319, 323–24, 34 Cal. Rptr. 474, 476 (1963); *People of City of Centralia v. City of Centralia*, 1 Ill.App.2d 228, 230, 117 N.E.2d 410, 411 (1953); *State ex rel. Frank, supra* 167 Kan. at 769, 208 P.2d at 200–01; *Hughes v. Bryan (In re initiative Petition Filed April 18, 1966)*, 425 P.2d 952, 953 (Okl.1967); *Amalgamated Transit Union—Division 757 v. Yerkovich*, 24 Or.App. 221, 224 n.2, 545 P.2d 1401, 1403 n.2 (1976); *Whitehead, supra* 204 Va. at 146–47, 129 S.E.2d at 693.

17. Initiative and referendum provisions in some jurisdictions authorize no subject matter screening in advance of the popular vote. In such states a court nevertheless may enjoin the

vote if the initiative or referendum is clearly outside the scope of the initiative or referendum right, *see, e. g., Boucher v. Engstrom*, 528 P.2d 456, 460 (Alaska 1974); *Harnett v. Sacramento County*, 195 Cal. 676, 683, 235 P. 445, 448 (1925); *Amalgamated Transit Union—Division 757 v. Yerkovich*, 24 Or.App. 221, 226, 545 P.2d 1401, 1404 n.7 (1976), or proposes a law that would be wholly illegal or unconstitutional. *See, e. g., Otey v. Common Council*, 281 F.Supp. 264, 275–79 (E.D.Wis.1968); *Whitson v. Anchorage*, 608 P.2d 759, 761–62 (Alaska 1980); *Dade County v. Dade County League of Municipalities*, 104 So.2d 512, 514–15 (Fla. 1958); *Rivergate Restaurant Corp. v. Metropolitan Dade County*, 369 So.2d 679, 682 (Fla.Dist. Ct.App.1979); *State ex rel. Bussie v. Fant*, 216 La. 58, 66, 43 So.2d 217, 219 (1949); *State ex rel. Steen v. Murray*, 144 Mont. 61, 68–69, 394 P.2d 761, 764–65 (1964) (per curiam). *But see Ranjel v. City of Lansing*, 417 F.2d 321, 324 (6th Cir. 1969); *Iman v. Bolin*, 98 Ariz. 358, 364–65, 404 P.2d 705, 709 (1965) (en banc); *Bowe v. Secretary of the Commonwealth*, 320 Mass. 230, 247, 69 N.E.2d 115, 127 (1946); *State ex rel. Althouse v. City of Madison*, 79 Wis. 97, 110–19, 255 N.W.2d 449, 455–59 (1977).

Board conclusively examines the bill itself to determine the propriety of the subject matter for the ballot.[18]

The unique procedural posture of this case does not change this focus on the bill itself as the controlling statement of the initiative. As indicated in Part II *supra,* the Initiative Procedures Act does provide a narrow exception from certain procedural requirements for "any initiative petition," such as CCRC's, that was "circulated on or after October 1, 1978, and before June 7, 1979 . . . ." *Id.* § 1–1119.2. Thus, the Act specifically exempts the CCRC petitions from the requirement of "approval of a summary statement, short title, and legislative form for an initiative measure *prior to* the circulation and filing of such petitions . . . ." *Id.* § 1–1119.2(c) (emphasis added); *see id.* § 1–1116(c)–(f).[19] Unlike initiatives that will be proposed in the future, therefore, this case lacks the guarantee that the Board and the proposer will have negotiated a summary statement of the initiative bill before the proposer circulates the petitions to the community.

The Initiative Procedures Act, however, does not exempt CCRC's petitions from the substantive "proper subject" requirement. *See id.* § 1–1116(k). In accordance with the procedural exemptions, the Act does provide that the Board may not refuse to accept CCRC's petitions as presenting an improper subject on the ground that the petitions are "not in the proper form," *id.* § 1–1116(k)(2), or that "the time limitation" for circulation and submission "has expired." *Id.* § 1–1116(k)(3); *see id.* § 1–1119.2. Otherwise,. however, the statute treats CCRC's petitions like any others submitted to the Board after the effective date of the Act. Accordingly, they must satisfy the "proper subject" inquiry under § 1–1116(k) by reference to the initiative bill itself.

### 2. *The CCRC Initiative*

We turn to the substance of the CCRC initiative. In the abstract, we can think of two ways in which opponents of the Convention Center could seek to stop the project. First, they could mount a substantive attack by attempting (a) to deauthorize construction of the Convention Center by amending (*pro tanto* repealing) the underlying substantive authorization for capital construction, D.C. Code 1973, § 9–220(a); *see* note 3 *supra,* to exclude the Convention Center, and (b) to prohibit its operation by repealing the substantive authorization for operation of the Center, D.C. Code 1980 Supp., §§ 9–601 to –610. *See* note 11 *supra* and accompanying text. Second, they could adopt a wholly fiscal strategy by seeking (a) to revoke appropriations for the project and (b) to force the Council to forbear from making future budget requests for the Center.

CCRC's original initiative bill (Initiative Measure No. 1) contains both approaches— substantive and fiscal—toward stopping the Convention Center. The bill does not explicitly state that it amends the underlying substantive authorization for capital construction projects, D.C. Code 1973, § 9–220(a), or repeals substantive authorization for operation of the Center. *See id.* 1980 Supp., §§ 9–601 to –610. Section three of the bill, however, would have the effect of removing the substantive underpinnings of the Center: "After the effective date of this measure, the District of Columbia

---

18. If the Board rejects an initiative, either before petitions are circulated or thereafter the proposer may sue to compel acceptance as CCRC has done. *See* D.C.Code 1980 Supp., § 1–1116(*l*); note 8 *supra.* Although that provision does not explicitly focus the court's attention on the initiative bill we see no appropriate, alternative basis for determining the propriety of an initiative's substantive scope. *See* note 16 *supra* and accompanying text.

19. In addition, the Act exempts CCRC from obtaining Board approval of the petition forms in advance of circulation, *see id.* §§ 1–1116(h)(1), 1–1119.2(a), and from circulating the petitions only after Board certification and then within 180 days of that approval. *See id.* §§ 1–1116(j)(1), (3), 1–1119.2(a). Other exceptions free the CCRC petitions from the requirements of the use of an assigned serial number, *see id.* §§ 1–1116(b), 1–1119.2(b), and printing in a prescribed form. *See id.* §§ 1–1116(g), 1–1119.2(d).

Government shall not construct or operate a Convention Center, or acquire land for that purpose." This section would place a substantive limitation on the power of the District to undertake "[a] program of construction to meet the capital needs of the government of the District of Columbia," D.C.Code 1973, § 9–220(a), and would prohibit operation of the Convention Center once it is built. *See id.* 1980 Supp., §§ 9–601 to –610. The repealer would take hold "after the effective date of this measure," that is, once the measure had passed through the required popular and congressional channels.

Initiative Measure No. 1, moreover, would seek to revoke appropriations for the project. By proscribing further construction or operation of the Center after the "effective date" of the measure, section three prohibits the expenditure of any appropriated funds for the Center once the measure has traveled the designated popular and congressional route. Section four makes explicit the message that the District is to wind up the project as soon as possible, using appropriated funds to settle broken contracts, but making no additional expenditures unrelated to the termination process. *See* Appendix A. It follows that Initiative Measure No. 1 also would prevent the Council from making any new request for funds to construct or operate the Center.

In short, Initiative Measure No. 1 would remove both the substantive and financial underpinnings of the Convention Center and bring the project to an immediate end.

### 3. *Postcirculation Revisions*

■ After the trial court had held that Initiative Measure No. 1 was outside the permissible scope of an initiative, *see Convention Center II, supra,* CCRC attempted to sustain its effort by matching the signatures it had collected on the petitions with an initiative bill that would conform to the *Convention Center II* dictum authorizing a prospective freeze. CCRC presumably recognized that it could not use these signatures to legitimize the initiative if the bill deviated materially from what CCRC had circulated to the community. On the other hand, given the trial court's decision, CCRC could not get the initiative on the ballot unless the measure had only a prospective effect. Thus, CCRC offered the Board two alternatives which it apparently hoped would satisfy these conflicting concerns.

First, CCRC submitted to the Board as an alternative bill the summary statement printed on its petitions (Initiative Measure No. 2). CCRC asked the Board to construe this new bill to prohibit only future budget requests for the Convention Center. Before the Board had ruled, CCRC submitted still another alternative bill (Initiative Measure No. 3), which incorporated Initiative Measure No. 2 and expressly confined its terms to the dictum of *Convention Center II* through the use of an additional, definitional section. The Board and the trial court subsequently rejected both attempts to reinterpret the initiative.

While we recognize that CCRC has had to work with a complicated and untried system to achieve a proper vehicle for a popular vote on the Convention Center, we agree with the trial court that if the Board had interpreted Initiative Measure No. 2, as requested, or accepted Initiative Measure No. 3, as written, its action would have been illegal.

In the first place, neither the Charter Amendments nor the Initiative Procedures Act expressly authorizes the proposers of an initiative, the Board, or the courts unilaterally to revise the substance of an initiative bill after circulation of petitions to the voters. The Charter Amendments provide that the Board "shall submit an initiative measure without alteration . . . ." D.C. Code 1980 Supp., § 1–183. The Initiative Procedures Act interprets this provision to permit the Board to make technical, but not substantive, changes before circulation to assure "proper legislative form." *Id.* § 1–1116(c)(3). This responsibility of the Board, as well as its duty to screen the bill for subject matter propriety after circulation of petitions, *see id.* § 1–1116(k); note 6 *supra,* may encourage the Board to give proposers some substantive guidance before circula-

tion, at the time the Board approves the summary statement; but it does not give the Board authority to revise the substance of a bill after circulation, even on the request of the proposer. Nor does CCRC's grandfather clause, *see id.* § 1–1119.2, give the Board the power (or CCRC the license) to revise the substance of CCRC's initiative after petitions have been circulated. The plain language of § 1–1119.2, providing exemption from general procedures, supports no such broad interpretation.[20]

In any event, it would be mischievous to read into the Charter Amendments and the Initiative Procedures Act a proposer's right to change the terms of a measure between circulation of petitions and submission to the voters. A threshold level of popular support, as evidenced by signatures on petitions, is a prerequisite for a vote on an initiative. *See id.* §§ 1–182, 1–1116(i). In most circumstances neither the proposer, the Board, nor the court could surmise with any confidence or accuracy that the petition-signers would have approved a different version of the initiative from the one summarized on the petitions.

Nor will it do to say that the electorate, in eventually voting on the initiative, could "cure" any error in perceiving the petition-signers' intent. If the role of the petition-signers is to have meaning in the initiative process, the bill they signed to support, in contrast with one materially rewritten or redefined to meet a statutory or constitutional objection, must be the bill put to the voters, if one is put to the voters at all.[21] Although our refusal to allow material alteration of a bill may lead to a harsh result for those who, in good faith, circulated petitions containing a bill that, in the end, cannot reach the ballot, it would be an even harsher result for the governmental process itself if we were to permit an initiative onto the ballot based on signatures which might not have been given for a materially altered bill. We must be able to say with conviction, based on the express terms of the initiative, what the petition-signers contemplated as acceptable.

In the case of a unitary capital project such as a convention center, we have no basis for knowing whether a person who signed a petition calling for a halt to the project in the current year also would sup-

---

**20.** Even this narrow grandfather clause encountered considerable opposition from Council members who felt that the enabling statute should not, in effect, make the Charter Amendments self-executing by ratifying actions taken before the adoption of implementing legislation. Proponents in turn stressed the limited nature of the procedural exception. Councilmember Betty Ann Kane explained:

> [L]ooking at the sections that it [the amendment] would waive or modify, I think we all had to conclude that those were very minor and preliminary kinds of sections, and that the basic legislation itself, which would not be affected by this amendment, contains some very, very important procedural safeguards.
>
> \* \* \* \* \* \*
>
> I hope everyone will support this amendment. What it does away with is the possibility that the Board of Elections will reject petitions that thousands and thousands of citizens have signed because it doesn't have an inch and a three-quarter margin at the top or 20 signatures on a page instead of ten. That's the kind of formal requirements that, for this first period of putting this legislation into effect, will be weighed. But, the other kinds of safeguards are there.

**21.** We do not reach the question whether, after circulation but prior to a popular vote, the Board or the court could sever (with or without a severability clause) improper sections of an initiative measure, and thus render it congruent with the permissible scope of the initiative power. *Cf. United States v. Jackson*, 390 U.S. 570, 585, 88 S.Ct. 1209, 1218, 20 L.Ed.2d 138 (1968) (court may sever unconstitutional sections of enacted statute if legislature likely would have passed law in any event). *See generally*, 2 C. Sands, Statutes and Statutory Construction § 44.01.20 (4th ed. 1973 & Supp. 1981). Although Initiative Measure No. 1 contains a severability clause, severance of improper provisions is impossible here, for both permissible and impermissible effects flow from the single operative sentence of section three. *See Neal v. Still*, 248 Ark. 1132, 1135, 455 S.W.2d 921, 923 (1970) (unconstitutionally vague portions of statute so "mutually connected and interwoven" in one sentence as to make severability impossible); *State ex rel. Steen v. Murray*, 144 Mont. 61, 66, 394 P.2d 761, 763–64 (1964) (per curiam) (same); Parts III.B.2. *supra*, IV.C. *infra*.

port merely a prospective freeze, with the waste of public funds that would result from dismantling a project well under way.[22] It may be true that petition-signers cannot, in any event, foretell with certainty the date when a capital project initiative might become effective. Moreover, we recognize that an upcoming vote on a prospective-only initiative might encourage administrators to make contingency plans for termination of the project, with the result that the actual impact might turn out to be somewhat more immediate than legally required. Nonetheless, there may be a substantial discrepancy between an initiative that would halt a project as soon as the people and Congress have spoken and one that would stop it only at the end of the latest fiscal year for which the Council has requested or Congress has appropriated funds.[23] There can be no assurance as to how administrators would deal with the problem under these different situations. Particularly, therefore, when we consider an initiative relating to an indivisible project, where timing of a stoppage is material to the cost-benefit assessment, there is no room for speculation whether the petition-signers would have been satisfied with a substantively different proposal.

Because an initiative, as circulated on petitions, cannot lawfully be changed in any material respect for submission to the voters, the Board and the trial court were correct in rejecting CCRC's attempt to submit Initiative Measure No. 2 (as interpreted) and No. 3 (as written). Although Initiative Measure No. 2 was circulated on the

petitions as the summary statement of the proposed measure, it was not susceptible to a "prospective only" interpretation. On its face it purported to prohibit expenditure of appropriated funds, as well as future budget requests. See Appendix B. In contrast, while initiative Measure No. 3 expressly called for only a prospective freeze on Convention Center funding, it was an impermissible, substantive revision of the original bill (Initiative Measure No. 1) summarized on the petitions.

In summary, in light of the scheme of the Initiative Procedures Act, the original intention of the proposers of the CCRC initiative, and the language reflecting that intention presented to the signers of the petitions, we conclude that the Board's acceptance of either Initiative Measure No. 2 or Initiative Measure No. 3 would have been improper. Thus, we must address our consideration to the original bill, Initiative Measure No. 1, the legal effect of which would be (1) to deauthorize construction and operation of the Convention Center, and (2) to stop further expenditure of funds appropriated for construction or operation of the project, as well as to stop submission of future budget requests to Congress.

## C. The Powers of the Council

Having defined the scope of the CCRC initiative, we turn to the question whether the District Council itself lawfully could pass such a bill. We first examine the Council's general powers under the Home Rule Act. We then consider the exception

---

**22.** A petitioner's intentions with respect to halting construction of a unitary capital project, therefore, are likely to be more difficult to discern than intentions as to a street-paving program, for example, which the government can stop at any time without material liquidation costs and which, to the extent completed presumably would be a net gain to the community.

**23.** For example, let us suppose that an initiative to halt a building project had passed at the popular election and, after the necessary congressional action, became effective today. If the initiative called for an immediate end to the project, all work on the project, at whatever stage it had reached, would stop today, and the

government would wind it up. If, however, the initiative called only for a prospective freeze, the project legally would not end until October 1982, the first month for which the Council has not yet adopted a budget request act. More specifically, because the District budget feeds into the Congressional appropriations process, see 31 U.S.C. § 1321 (1976); Part III.C. infra, the Council must act on budgetary matters far in advance of the fiscal year under consideration. The budget request act for Fiscal Year 1982, which ends on September 30, 1982, became effective on November 25, 1980. See 31 U.S.C. § 1321 (1976); Fiscal Year 1982 Budget Request Act, Act 3–294, 27 D.C.Reg. 5315 (1980).

to those powers for the budgetary process, as well as other statutory limitations which appellees contend would prevent the Council from adopting an act like the CCRC initiative. Contrary to appellees' position, we conclude that the Council through its substantive and fiscal powers, could so act.

### 1. Home Rule Powers

In establishing self-government for the District of Columbia, Congress wished "to the greatest extent possible, consistent with the constitutional mandate [to] relieve [itself] of the burden of legislating upon essentially local District matters." D.C.Code 1978 Supp., § 1–121(a); see *District of Columbia v. Washington Home Ownership Council, Inc.,* D.C.App., 415 A.2d 1349, 1351 (1980) (en banc); *McIntosh v. Washington,* D.C.App., 395 A.2d 744, 753 (1978). Various members of Congress apparently had in mind different models for the new governmental structure, including a federal agency, a municipality, a state, a territory, and a city-state. See Newman & DePuy, *Bringing Democracy to the Nation's Last Colony: The District of Columbia Self-Government Act,* 24 Am.U.L.Rev. 537, 556–69 (1975). Congress ultimately delegated to the District legislative control over most of its own affairs:

> Except as provided in sections 1–126, 1–147, and 47–228, the legislative power of the District shall extend to all rightful subjects of legislation within the District consistent with the Constitution of the

United States and the provisions of this Act subject to all the restrictions and limitations imposed upon the States by the tenth section of the first article of the Constitution of the United States. [D.C. Code 1978 Supp., § 1–124.]

Congress vested this legislative power in the Council, see *id.* § 1–144(a),[24] but, in order to comply with its constitutional duties,[25] Congress retained a role in the legislative process. The Council's ordinary legislation becomes effective only after a 30-legislative-day layover in Congress, and is subject to disapproval by concurrent resolution during that period. *Id.* §§ 1–144(e), –147(c)(1); see *Washington Home Ownership Council, Inc., supra* at 1351–52; Newman & DePuy, *supra* at 631–34; note 14 *supra.*[26]

Although subject to congressional review, the Council's powers of ordinary legislation are broad; they are limited only by specified exceptions and by the general requirement that legislation be consistent with the U.S. Constitution and the Home Rule Act. See *Bishop v. District of Columbia,* D.C. App., 411 A.2d 997, 999 (en banc), *cert. denied,* 446 U.S. 966, 100 S.Ct. 2943, 64 L.Ed.2d 825 (1980); *McIntosh, supra* at 751–54. In this sense, the District resembles a full "home rule" city with general powers to govern local affairs except for express limitations, in contrast with a limited "home rule" city or a municipal corporation to which a state has granted only enu-

---

**24.** D.C.Code 1978 Supp., § 1–144(a) provides:
Subject to the limitations specified in sections 1–126, 1–127, 1–147, and 47–228, the legislative power granted to the District by this Act is vested in and shall be exercised by the Council in accordance with this Act. In addition, except as otherwise provided in this Act, all functions granted to or imposed upon, or vested in or transferred to the District of Columbia Council, as established by Reorganization Plan Number 3 of 1967 shall be carried out by the Council in accordance with the provisions of this Act.
*Cf. id.* § 1–162 ("The executive power of the District shall be vested in the Mayor ...."); *id.* tit. 11 app. § 431(a) ("The judicial power of the District is vested in the District of Columbia Court of Appeals and the Superior Court of the District of Columbia.").

**25.** See D.C.Code 1978 Supp., § 1–121(a). Article I, section 8 of the United States Constitution provides in part: "The Congress shall have Power ... To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of Particular States, and the Acceptance of Congress, become the Seat of the Government of the United States ...."

**26.** Congress also reserved the power to approve amendments to the District Charter, *see* D.C.Code 1978 Supp., § 1–125(b), and affirmatively to legislate for the District. *See Washington Home Ownership Council, Inc., supra* at 1352 n.9; D.C.Code 1978 Supp., § 1–126.

merated powers. *See generally* 2 E. McQuillin, *supra* §§ 9.01–.08b, 10.08–.17. As a general rule, courts strictly construe the powers of municipal corporations, *see id.* §§ 10.18a–.24, whereas they liberally read the authority ˙of full "home rule" cities. *See id.* § 10.25.[27] In construing the delegation of legislative power to the Council, however, this court must pay substantial attention to the unique nature of the District's polity, *see* note 15 *supra*, always interpreting the Home Rule Act "with a central focus: the intent of Congress." *Washington Home Ownership Council, Inc., supra* at 1351 (footnote omitted).

## 2. *The Budgetary Exception*

One exception to the general delegation of legislative authority concerns the budgetary process. D.C.Code 1978 Supp., § 47–228 provides in relevant part:

> Nothing in this Act shall be construed as making any change in existing law, regulation, or basic procedure and practice relating to the respective roles of the Congress, the President, the Federal Office of Management and Budget, and the Comptroller General of the United States in the preparation, review, submission, examination, authorization, and appropriation of the total budget of the District of Columbia government. [*Id.* § 47–228(a).]

### a. *The Budgetary Process*

The Home Rule Act establishes a unique and complex budgetary procedure for the District which, in broad outline, proceeds as follows: The Mayor initially proposes the budget and submits it to the Council. D.C. Code 1978 Supp., § 47–221(a). The Council then has fifty days in which to consider and "adopt" a District budget by "act." *Id.* § 47–224. The Council then transmits this "budget request act" back to the Mayor, *see id.* § 1–144(e), who has line-item veto power. *See id.* § 1–144(f). The Council can override any such veto by a two-thirds vote. *Id.* The Mayor then submits the final budget request act to the President. *Id.* § 47–224.

After the federal Office of Management and Budget has reviewed the District budget, *see* 31 U.S.C. §§ 2, 16, 26 (1976), the President submits the final version to Congress. *See id.* § 11(a). After committee consideration, Congress passes and transmits to the President the annual D.C. Appropriations Act. *See* 31 U.S.C. §§ 1301–53 (1976); D.C.Code 1978 Supp., § 47–224. An appropriations item that lacks underlying substantive authorization may be subject to a point of order in the House of Representatives.[28]

The annual Appropriations Act authorizes District officials to obligate and expend the

**27.** *See, e. g., City of Grass Valley v. Walkinshaw,* 34 Cal.2d 595, 598–99, 212 P.2d 894, 896–97 (1949) (en banc); *Hutchinson Human Relations Commission v. Midland Credit Management, Inc.,* 213 Kan. 308, 313–14, 517 P.2d 158, 162–63 (1973); *Capitol Cable, Inc. v. City of Topeka,* 209 Kan. 152, 159–60, 495 P.2d 885, 891–92 (1972); *1426 Woodward Avenue Corp. v. Wolff,* 312 Mich. 352, 369–70, 20 N.W.2d 217, 222–23 (1945); *Whelan v. New Jersey Power & Light Co.,* 45 N.J. 237, 251, 212 A.2d 136, 143 (1965); *Greenberg v. City of Bradford,* 432 Pa. 611, 616. 248 A.2d 51, 53–54 (1968).

**28.** House Rule XXI, § 2 provides:

No appropriation shall be reported in any general appropriation bill, or be in order as an amendment thereto, for any expenditure not previously authorized by law, unless in continuation of appropriations for such public works and objects as are already in progress.

W. Brown, Constitution, Jefferson's Manual and Rules of the House of Representatives of

the United States Ninety-Sixth Congress, H.R. Doc.No. 95–403, 95th Cong., 2d Sess. 525 (1979).

Similarly, Senate Rule XVI, § 1, prohibits amendments to appropriations bills that lack underlying substantive authorization:

All general appropriation bills should be referred to the Committee on Appropriations, and no amendments shall be received to any general appropriation bill the effect of which will be to increase an appropriation already contained in the bill, or to add a new item of appropriation unless it be made to carry out the provisions of some existing law, or treaty stipulation, or act, or resolution previously passed by the Senate during that session; or unless the same be moved by direction of a standing or select committee of the Senate, or proposed in pursuance of an estimate submitted in accordance with law.

Committee on Rules and Administration, United States Senate, Senate Manual, S.Doc.No.95–1, 95th Cong., 1st Sess. 17 (1977).

revenues of the District for approved programs, see D.C.Code 1978 Supp. § 47–224, and also may authorize the Mayor to borrow funds to finance capital projects. *See id.* § 47–241 & note ("Interim Loan Authority") (Home Rule Act, *supra*, tit. VII, § 723, *as amended by* Act of Oct. 13, 1977, Pub. L.No. 95–131, § 1, 91 Stat. 1155). Thus, although the Council authorizes programs and approves the District budget for transmission to the President, the Congress itself finally appropriates the funds. *See generally* Newman & DePuy, *supra* at 591–94.

The Home Rule Act also permits revisions of the District budget through essentially the same process as the original budget. "The Mayor from time to time may prepare and submit to the Council such proposed supplemental or deficiency budget recommendations as in his judgment are necessary on account of laws enacted after transmission of the budget or are otherwise in the public interest." D.C.Code 1978 Supp., § 47–221(c); *see* 31 U.S.C. §§ 2, 22 (1976). If the Council adopts a supplemental budget request act, *see* D.C.Code 1978 Supp., § 47–224, the Mayor may approve it, *see id.* § 1–144(e), or subject it to line-item veto, *see id.* § 1–144(f) which the Council in turn may override. *See id.* The Mayor transmits the final version of the supplemental budget request act to the President. *See id.* § 47–224. The office of Management and Budget examines the act, *see* 31 U.S.C. §§ 24, 26 (1976), and the President then submits it to Congress. *See id.* § 11(g). Congress ultimately must approve any supplemental appropriations act. *See* 31 U.S.C. §§ 1301–53 (1976); D.C.Code 1978 Supp., § 47–224. Although the term "supplemental" implies a request for additional appropriations, the Council also may use such an act to request reductions in appropriations. *See, e. g.* Fiscal Year 1980 Supplemental Budget Request Act of 1980, Act 3–170, § 2, 27 D.C.Reg. 1368 (1980); Supple-

mental Appropriations & Rescission Act, 1980, Pub.L.No. 96–304, ch. IV, 94 Stat. 857, 866 (1980).

### b.  *Deauthorization and Defunding*

■ The question presented is whether, given this legislative structure, the Council can halt an ongoing capital project (1) by repealing or amending the underlying substantive authorization for the budget item after Congress has appropriated funds for it, or (2) simply by halting further expenditure of funds appropriated for the project (and, of course, declining to make future budget requests for it). We conclude that the Council, pursuant to its powers of ordinary legislation, can remove the substantive authorization for a funded project; but, to the extent Congress has appropriated funds for the project, the Council can halt further expenditure only through the more elaborate requirements of the budget process, even though the project has been formally deauthorized.[29]

Under the Home Rule Act, the Council could begin by taking either a substantive or a fiscal approach to halting a project during the course of a fiscal year. The Council, for example, initially could invoke its ordinary legislative power to repeal or amend the law that authorizes the project. See D.C.Code 1978 Supp., §§ 1–124, –144(a). The effect of such action would vary depending on the stage of the program. If the Council deauthorized a project before adopting a budget request act, the project presumably would go no further. If the Council acted after adoption of a budget request act but before congressional passage of an appropriations act, the absence of substantive authorizing legislation could leave the budget item subject to a point of order in the House of Representatives, *see* note 28 *supra*;[30] otherwise, the congressional appropriations process would continue.

---

**29.** We recognize the possibility that legislation by the Council or an initiative by the electorate could infringe on the executive functions vested in the Mayor. *See* D.C.Code 1978 Supp., §§ 1–162 to –163, 47–226, –241. We conclude that this initiative does not present such a problem. *See* Part III.D. *infra.*

**30.** Only the first appropriation for a capital project would be subject to challenge for lack of underlying substantive authorization. *See* note 28 *supra.*

If the Council repealed the substantive authorization for a project after Congress had appropriated funds (or if the Council repealed it before the appropriation, without also repealing the budget request act in the absence of a point of order), the Council's repealer alone would not halt the project; Congress would have to rescind the appropriation, in order to end the project during the current fiscal year. The structure of the Home Rule Act compels this view. In the ordinary legislative process, the role of Congress is passive: a deauthorization by the Council becomes effective through mere congressional acquiescence during the layover period. See D.C.Code 1978 Supp., §§ 1–144(e), –147(c)(1). In the budget process, by contrast, Congress has retained a key role: appropriations for the District depend on an affirmative congressional act. See id. § 47–224. If we were to construe the Home Rule Act to permit deauthorizing legislation by the Council (even if it survived a 30-day congressional layover) to undercut the affirmative congressional approval reflected in the appropriation of funds for a project, we would undermine the role of Congress in the District's governmental structure. We would be permitting the Council, improperly, to use a relatively easy legislative track to interdict a project which Congress has approved by taking a step beyond acquiescence in program authorization: the affirmative appropriation of funds. See id. § 47–228(a).

We conclude, therefore, that a substantive deauthorization by the Council can halt a funded project during the current fiscal year only if implemented by a supplemental budget request act followed by a congressional supplemental appropriations act rescinding or transferring appropriations for the deauthorized program. See 31 U.S.C. § 11(b) (1976); D.C.Code 1978 Supp., §§ 47–221(c), –224.[31]

There remains an obvious question: once Congress has appropriated funds, can the Council halt the project by using the budget process alone, rather than begin by repealing the underlying substantive authorization? We answer yes; the Council could adopt a supplemental budget request act seeking rescission or transfer of appropria-

---

**31.** Pursuant to its authority to adopt supplemental budget requests acts, see D.C.Code 1978 Supp., § 47–224, the Council can add a request for rescission or transfer of appropriations for a deauthorized project to any supplemental budget request act proposed by the Mayor under id. § 47–221(c), which provides in part: "The Mayor from time to time may prepare and submit to the Council such proposed supplemental or deficiency budget recommendations as in his judgment are necessary on account of laws enacted after transmission of the budget or are otherwise in the public interest."

Although § 47–221(c) gives the Mayor discretion to propose supplemental budget recommendations, we do not understand the statute to grant the Mayor exclusive authority to determine when a supplemental budget request act is necessary. Section 47–221(c) grants the Mayor, as the chief executive, the right to initiate such a proposal; but it does not give the Mayor authority to use the budgetary process to block the Council's legislative program by refusing to facilitate funding adjustments at mid-year (other than by use of the veto, subject to override, once a supplemental budget request act has been adopted). To read such exclusive authority into § 47–221(c) would be contrary to the fundamental statutory framework giving the Council, not the Mayor, ultimate authority (subject to congressional review) over the District's annual budget, as reflected in the first paragraph of § 47–221 (captioned "submission of annual budget"): "At such time as the Council may direct, the Mayor shall prepare and submit to the Council each year, and make available to the public, an annual budget for the District of Columbia government ...." Id. § 47–221(a) (emphasis added). Paragraph (c) of § 47–221 is subordinate to this fundamental prerogative of the Council.

As an alternative to a supplemental appropriations act, Congress could consider a transfer of appropriations through a "reprogramming" proposal to the House and Senate Appropriations committees. See Reprogramming Policy Act of 1980, D.C.Law 3–222, 27 D.C.Reg. 3617 (1980) (to be codified at D.C.Code § 47–283); House Committee on Appropriations, Report Accompanying District of Columbia Appropriations Bill, 19__, H.R.Rep.No. 96–443, 96th Cong., 1st Sess. 15–16 (1979); House Committee on Appropriations, Report Accompanying District of Columbia Appropriations Bill, 1972, H.R.Rep.No. 92–684, 92d Cong., 1st Sess. 19 (1971); Senate Committee on Appropriations, Report Accompanying District of Columbia Appropriations Bill, 1972, S.Rep. No. 92–550, 92d Cong., 1st Sess. 25 (1971).

tions for the fiscal year. *See* 31 U.S.C. § 11(b) (1976); D.C.Code 1978 Supp., §§ 47–221(c), 224; note 31 *supra*.[32] Use of the budget process to end a project would respect the role of Congress in the District's fiscal affairs and thus comport with the Home Rule Act. *See id.* § 47–228(a).[33]

In summary, consistent with the Home Rule Act, the Council could seek to halt an ongoing project during the current fiscal year (1) by repealing the substantive authorizing legislation, followed by a supplemental budget request act seeking rescission or transfer of appropriations; or (2) initially adopting a supplemental budget request act seeking rescission or transfer of appropriated funds. The question remains: Are such

acts "legislative" acts that the electorate can adopt by initiative?

### D. A Legislative Act

■ There is a corollary of the rule that the power of the electorate to act by initiative is coextensive with the legislative power: an initiative cannot extend to administrative matters. *See* 5 E. McQuillin, *supra* § 16.55. Although many courts have barred initiatives from the ballot on the ground that the act proposed is "administrative," not "legislative," we conclude that the CCRC initiative does not run afoul of this corollary.

The test of "legislative" and "administrative" matters that other jurisdictions most

---

**32.** Similarly, if the Council adopted a budget request act including a particular item but had second thoughts before Congress had passed an appropriations act, the Council could enact a budget amendment revoking the request. *See* 31 U.S.C. § 11(g) (1976); D.C.Code 1978 Supp., § 47–224.

**33.** No other provision of the Home Rule Act nor any federal statute precludes the Council from deauthorizing a capital project or attempting, through the budget process, to rescind financing for an authorized project after Congress has appropriated funds. The Home Rule Act does mandate that "[n]o amount may be obligated or expended by any officer or employee of the District of Columbia government unless such amount has been approved by Act of Congress, and then only according to such Act." D.C.Code 1978 Supp., § 47–224. But this statement does not mean that the District is irrevocably committed to spending appropriated funds. It simply means that the District may not incur obligations unless authorized by a congressional appropriations act.

Nor does the general federal statute concerning appropriations for the construction of public buildings prevent the Council from changing its mind about a project. Unlike other appropriations, which are available only for the fiscal year, 31 U.S.C. § 718 (1976), appropriations for capital projects remain available until completion.

> All moneys appropriated for the construction of public buildings shall *remain available* until the completion of the work for which they are or may be, appropriated; and upon the final completion of each or any of said buildings, and the payment of all outstanding liabilities therefor, the balance or balances remaining shall be immediately covered into the Treasury. [31 U.S.C. § 682 (1976) (emphasis added).]

This statute is permissive, not mandatory. The continued availability of funds appropriated for construction of a public building falls far short of irrevocably *requiring* their expenditure.

The District of Columbia Appropriations Acts merely reiterate the rule of this general statute; they do not irrevocably mandate the expenditure of funds appropriated for capital projects. For example, the D.C. Appropriations Act, 978, approved June 5, 1978, provides:

> Notwithstanding the foregoing, all authorizations for capital outlay projects, except those projects covered by the first sentence of section 23(a) of the Federal Aid Highway Act of 1968 (Public Law 90–195 approved August 23, 1968) for which funds are provided by this paragraph, shall expire on September 30, 1979, except authorizations for projects as to which funds have been obligated in whole or in part prior to such date. Upon expiration of any such project authorization the funds provided herein for such project shall lapse .... [D.C. Appropriations Act, 1978, *supra*, tit. 2.]

The D.C. Appropriations Acts of 1980 and 1981 contain the same provision, except the expenditure authorizations for capital projects included in those acts expire on September 30, 1981, and September 30, 1982, respectively. *See* D.C. Appropriations Act, 1981, *supra*; D.C.Appropriations Act, 1980, *supra*.

These appropriations acts expressly provide that the authorization for expenditure of appropriated funds shall lapse after the specified period if the District has obligated no funds for the project within that period; but if the District commences a project within that time, the authorization to spend the appropriated funds continues. These acts, however, do not preclude the Council from initiating an appropriations repealer.

frequently have employed is "whether the proposition is one to make new law or to execute law already in existence." 5 E. McQuillin, *supra* § 16.55, at 213 (footnote omitted).[34] Using this test, courts have invalidated initiatives that would meddle

with the details of executing established policy.[35] Courts, however, have called initiatives "legislative" when they have addressed the basic policy question whether or not to undertake a capital project, even after the project has begun.[36] This jurisdic-

---

34. In this commonly cited passage, McQuillin offers two other tests of the legislative/administrative distinction. First, McQuillin notes that when a local governing body implements a state policy or participates in a national regulatory program, courts have held that the locality—as the deputy of the higher government—is engaged in an administrative function, and the electorate accordingly cannot interfere with it by initiative or referendum. *See, e. g., Simpson, supra* 36 Cal.2d at 133–34, 222 P.2d at 229–30; *State ex rel. Nelson v. Butler,* 145 Neb. 638, 646–47, 17 N.W.2d 683, 689–90 (1945); *Hughes v. Bryan, (In re Initiative Petition Filed April 18, 1966),* 425 P.2d 952, 954 (Okla.1967); *Amalgamated Transit Union—Division 757 v. Yerkovich,* 24 Or.App. 221, 227–28, 545 P.2d 1401, 1405 (1976). *See generally* 5 E. McQuillin, *supra* § 16.55, at 212–13 & n.98.

Even if we were to adopt this test, this prohibition would not apply here. Construction and operation of the Convention Center do not reflect a congressional policy for a District or national regulatory scheme which the District government is deputized to administer. Although Congress enacted the original version of the general authorization of capital construction, D.C.Code 1973, § 9–220(a), in 1958, *see* Act of June 6, 1958, Pub.L.No. 85–451, 72 Stat. 183, the Council now has power to repeal or amend that statute. *See* D.C.Code 1978 Supp., § 1–124. Similarly, the Council could repeal or amend its own recent statute authorizing operation of the Convention Center, *id.* 1980 Supp., §§ 9–601 to –610. *See id.* 1978 Supp., § 1–124. Although Congress retains power to legislate for the District and to override Council action, *see id.* §§ 1–126, –144(e), –147(c), that reserved power does not convert capital projects in the District into federal programs which the District administers as an agent of the Congress. The Home Rule Act manifests an intent precisely to the contrary. *See id.* § 1–121(a).

As a final test of the legislative/administrative dichotomy, McQuillin states: "Actions relating to subjects of a permanent and general character are usually regarded as legislative, and those providing for subjects of a temporary and special character are regarded as administrative." 5 E. McQuillin, *supra* § 16.55, at 213. This distinction is of little help and it is relied upon infrequently. In any event, we hardly can regard the construction and operation of a $98.7 million convention center as "temporary."

35. *See, e. g., Mueller v. Brown,* 221 Cal.App.2d 319, 327, 34 Cal.Rptr. 474, 478 (1963) (initiative to preserve old courthouse and surrounding park interferes with execution of Board of Supervisors' resolution approving construction of new courthouse on site); *Whitehead, supra* 204 Va. at 151, 129 S.E.2d at 696 (although establishment of city-owned water system is legislative decision, initiative to change expense factor in maintenance interferes with administration); *Heider, supra* 37 Wis.2d at 474–77, 155 N.W.2d at 21–22 (initiative to prohibit Council from approving capital expenditure for high school addition for three years and to prohibit tax levy for addition unless City Planning Commission adopts master plan interferes with execution of Council resolution, requested by Board of Education and approved by popular vote, authorizing issuance of bonds for school construction, and with Commission's execution of statutory duty to adopt master plan).

36. *See, e. g., Teachers Management & Investment Corp. v. City of Santa Cruz,* 64 Cal. App.3d 438, 447, 134 Cal.Rptr. 523, 529 (1976) ("decision of a city to build and operate a public structure is unquestionably legislative in nature" and, accordingly, is proper subject of initiative); *Duran v. Cassidy,* 28 Cal.App. 574, 582, 104 Cal.Rptr. 793, 799 (1972) (people have right to propose initiative halting development of golf course as part of city park even after construction of course has begun); *Paget, supra* 78 Wash.2d at 356, 474 P.2d at 251 (people have right to propose initiative vetoing County Commissioners' selection of site for public stadium); *cf. State ex rel. Ballantyne v. Leeman,* 149 Neb. 847, 858, 32 N.W.2d 918, 923 (1948) (authorizing construction of municipal auditorium was act of legislation, but referendum on ordinance to assess property to be taken by eminent domain interferes with administration of project); *Monahan v. Funk,* 137 Or. 580, 587–88, 3 P.2d 778, 780–81 (1931) (referendum on ordinance to purchase site for incinerating plant interferes with administration of project, but *electors could seek to repeal charter provision authorizing Council to issue bonds to finance plant construction*). *But see Ruano v. Spellman,* 81 Wash.2d 820, 824, 505 P.2d 447, 450 (1973) (en banc) (in light of two prior popular votes on construction of public stadium, initiative to halt project impermissibly interferes with execution of firmly established decision to proceed).

tion also has recognized the "policy" basis of the distinction between legislative and administrative powers.[37] Contrary to appellees' view, we conclude that, in both its substantive and fiscal aspects, the CCRC initiative is "legislative." It does not address merely administrative concerns or impermissibly interfere with the execution of existing law.

First, the substantive effect of the CCRC initiative would be to amend the District's general capital construction statute, D.C. Code 1973, § 9–220(a), removing authorization for the Convention Center, and also to repeal the law providing for its operation. *Id.* 1980 Supp., §§ 9–601 to –610. *See* Part III.B.2 *supra*.[38] Appellees do not dispute that the Council or the voters can repeal or amend such authorizing legislation to stop a particular capital project before Congress has appropriated funds for it. Appellees contend, however, that once Congress has funded the project, any act of the Council or the electorate to halt the project intrudes into the administrative sphere. This argument implies that the general capital construction statute, D.C.Code 1973, § 9–220(a), already has created a specific, though unrevealed, Platonic Form of the District of

---

**37.** This jurisdiction has defined "legislative power" in the following terms:

The line between the exercise of legislative power and the exercise of other governmental powers ... is vague in borderline cases, but whatever the boundary of legislative power may be, it clearly includes an action which adopts a policy affecting the public generally and sets in motion the effectuation of that policy. If an action is merely by way of fact-finding in the course of effectuating a policy declared by the legislature, or is merely the formulation of rules and regulations for the purposes of such effectuation, the action is administrative. But if an action is the declaration and adoption of a policy and program by which affairs of general public concern are to be controlled, the action is a legislative act.

*Woods v. Babcock,* 88 U.S.App.D.C. 37, 39, 185 F.2d 508, 510 (1950) (footnotes omitted), *vacated as moot sub nom. City of Los Angeles v. Woods,* 340 U.S. 908, 909, 71 S.Ct. 294, 294, 95 L.Ed. 657 (1951) (per curiam).

**38.** The initiative right conferred by the Charter Amendments, D.C.Code 1980 Supp., § 1–181(a), includes the right to repeal and amend existing legislation. The statute gives the electorate the right to propose "laws," and the word "laws" includes both new legislation and the amendment and repeal of existing legislation. *See* 6 E. McQuillin, *supra* §§ 21.02, .10.

The legislative history of the charter amendments reinforces the generic meaning of this term. During the hearings of the Council Committee on Government Operations, the late Councilmember Julius Hobson, the author of the original Charter Amendment bill, wondered whether "30 working days ... is enough time for a citizen to get a referendum on the ballot?" The Committee Clerk responded that the thirty-day time frame corresponded to the congressional layover period. *See* D.C.Code 1978 Supp., § 1–147(c). He continued, "Should the citizens desire, basically, to reverse a decision of the Council which has already become law,

they would then have the ability to initiate through the initiative process the same measure to the ballot." Reflecting the same view, the Committee Report on the bill stated that the referendum right would attach only during the layover period; however, "[o]f course, the people could undertake to have an initiative item placed on the ballot which would have substantially the same impact."

As this legislative history makes clear, the mere existence of a referendum right to approve or disapprove acts of the Council, *see* D.C.Code 1980 Supp., § 1–181(b), does not imply that the electorate cannot use the initiative to repeal or amend existing legislation. Rather than being mutually exclusive, the two processes of initiative and referendum overlap. *See Klosterman v. Marsh,* 180 Neb. 506, 511, 143 N.W.2d 744, 748 (1966).

Courts in many other jurisdictions have interpreted their initiative provisions as extending to the repeal of existing laws. *See, e. g., Blotter v. Farrell,* 42 Cal.2d 804, 811, 270 P.2d 481, 485 (1954) (en banc); *Duran v. Cassidy,* 28 Cal.App.3d 574, 582, 104 Cal.Rptr. 793, 799 (1972); *St. Paul Citizens for Human Rights v. City Council,* Minn., 289 N.W.2d 402, 405 (1979) (en banc); *State ex rel. Boyer v. Grady,* 201 Neb. 360, 366–67, 269 N.W.2d 73, 77 (1978); *Dawson v. Tobin,* 74 N.D. 713, 736–37, 24 N.W.2d 737, 748 (1946); *State ex rel. Sharpe v. Hitt,* 155 Ohio St. 529, 538–40, 99 N.E.2d 659, 664 (1951); *Bachmann v. Goodwin,* 121 W.Va. 303, 307, 3 S.E.2d 532, 533 (1939). *But see Batten v. Hambley,* 400 S.W.2d 683, 685 (Ky. 1966); *In re Initiative Petition No. 1 (Smith v. Melton),* 465 P.2d 470, 472 (Okl.1970); *Hughes v. Bryan (In re Initiative Petition Filed April 18, 1966),* 425 P.2d 952, 954 (Okl.1967); *Wyatt v. Clark,* 299 P.2d 799, 802 (Okl.1956); *Ruano v. Spellman,* 81 Wash.2d 820, 824, 505 P.2d 447, 450 (1973) (en banc); *Heider, supra* 37 Wis.2d at 478, 155 N.W.2d at 24; *Landt v. City of Wisconsin Dells,* 30 Wis.2d 470, 476–80, 141 N.W.2d 245, 248–50 (1966).

Columbia which remains only to be discovered, brought to earth, and built—a group of ministerial, not policy, actions. This view of § 9–220(a) is untenable.

Section 9–220(a) does authorize "[a] program of construction to meet the capital needs" of the District government, *id.*, and permits appropriations without additional authorization. *Compare* note 28 *supra*. But not all decisions pursuant to that broad authorization—including the basic decision whether or not to undertake a particular project—properly can be called "administrative." The question whether or not to undertake each specific capital project involves serious consideration of its benefits and costs. A decision to build reflects a determination that the project will meet the needs of the government and the public. As appellees recognize, what those needs are, and what type of edifice the government requires to serve those needs, are policy issues.

Even after having made an initial decision to build, the Council has the power to reconsider and reverse that decision. *See* Part III.C.2.b. *supra*. Although the Mayor is the chief executive of the District, *see* D.C.Code 1978 Supp., §§ 1–162 to –163, and its financial administrator, *see id.* §§ 47–224 to –226, –241 & note, these duties depend on legislative authorization and funding of the programs to be administered. If the Council reconsiders the advisability of a project and determines to shut it down, that decision is as much a policy decision as the original go-ahead. *See* note 36 *supra*. It cannot be said to interfere with project administration or merely to affect the execution of a law as vague and broad as § 9–220(a).

As discussed in Part III.C.2.b. *supra*, however, the Council cannot halt a project in the course of a fiscal year solely by deauthorizing it. Rather—either *after* deauthorization or as the initial strategy—the Council must proceed through the budget process to rescind program funding. We therefore must address appellees'—and Chief Judge NEWMAN'S—argument that even if deauthorization of a capital project

is legislative, "a budget request . . . , though labeled an 'act,' is clearly not a legislative action." We disagree.

The Council's budget request acts represent the formulation of a set of governmental priorities by the elected representatives of the public. The determination of the levels of funding to request from Congress for competing programs involves a myriad of policy decisions. The passage of the budget, therefore, is legislative action. *See State ex rel. Keefe v. City of St. Petersburg*, 106 Fla. 742, 761, 145 So. 175, 177 (1933) (en banc) (per curiam). *But see Cuprowski v. City of Jersey City*, 101 N.J.Super. 15, 27–28, 242 A.2d 873, 879–80 (Super. Ct.Law Div.), *aff'd*, 103 N.J.Super. 217, 247 A.2d 28 (Super.Ct.App.Div.1968) (per curiam).

Although it is true that the Council's budget request acts are subject to review by the federal executive and funding by Congress, *see* Part III.C.2. *supra; cf.* note 34 *supra*, the unique structure of the District budgetary process does not render the Council's role administrative. The District budgetary process involves two legislatures: the Council and Congress. The Council's ordinary legislation is no less "legislative" because of the congressional layover required. *See* Part III.C.1. *supra*. Similarly, the Council's adoption of a budget is a legislative act, albeit subject to review and revision in other quarters.

Most telling, however, are the Charter Amendments themselves. The grant of the initiative right contains an exception: the electorate may propose "laws," but not "laws appropriating funds." D.C.Code 1980 Supp., § 1–181(a). The legislative history of this phrase shows that it encompasses both the Council's budget request acts and Congress' appropriations acts. *See* Part IV.A. *infra*. The statute itself thus indicates that a budget request act is a type of "law."

In summary, the CCRC initiative represents an effort through both substantive and fiscal means to reverse the legislative policy determination that the District should build and operate a convention cen-

ter. The fact that the initiative would affect budgetary decisions does not make it any less a legislative determination. It does not impinge on executive functions. Because the Council properly could pass an act having the same effects as the CCRC initiative, see Part III.C. supra, that initiative must be said to propose a "law" within the meaning of the Charter Amendments, D.C.Code 1980 Supp., § 1–181(a).

## IV. THE CCRC INITIATIVE PROPOSES A "LAW APPROPRIATING FUNDS"

Although the CCRC initiative does propose a "law," we conclude that the initiative right does not extend to the subject matter of this measure. The Charter Amendments exception barring all initiatives for "laws appropriating funds," D.C.Code 1980 Supp., § 1–181(a) (reflected in the "Dixon Amendment" of the Initiative Procedures Act, id. § 1–1116(k)(7)), precludes this initiative.

### A. "Laws Appropriating Funds"

■ In addition to the requirement that an initiative propose a "law," the Charter Amendments expressly create one exception to the initiative right. Electors may not propose "laws appropriating funds." Id. § 1–181(a). Appellants maintain that this exception applies only to affirmative acts of appropriation. Because the CCRC initiative seeks to "unappropriate" funds, this exception, they say, does not apply. Appellees disagree, contending that the exception is broader. They argue that it also bars any initiative, such as CCRC's, that would stop the expenditure of appropriated funds.

Our task in construing the statute " 'is to ascertain and give effect to legislative intent and to give legislative words their natural meaning.' " Citizens Association of Georgetown v. Zoning Commission of the District of Columbia, D.C.App., 392 A.2d 1027, 1032 (1978) (en banc) (quoting Rosenberg v. United States, D.C.App., 297 A.2d 763, 765 (1972) (citations omitted)). We begin this process of course with the language of the statute itself. Citizens Association

of Georgetown, supra; March v. United States, 165 U.S.App.D.C. 267, 274, 506 F.2d 1306, 1313 (1974). We must read these words, however, in their legislative context. See Citizens Association of Georgetown, supra at 1033; March, supra at 274–75, 506 F.2d at 1313–14.

Because of the unique features of our home rule process, "laws appropriating funds" exception is ambiguous on its face. For example, although the Council has considerable legislative power, technically it does not enact "laws" but only (1)"acts" which become "laws" after congressional layover, see D.C.Code 1978 Supp., §§ 1–144 to –147; (2) "budget acts," which are one step in a complex appropriations process, see id. § 47–224; (3) "resolutions," see id. § 1–146(a); and (4) "rules," see id. § 1–144(c). Furthermore, although the Council requests funds, it is Congress, not the Council, that actually does the "appropriating." See id. § 47–224. Finally—and of considerable significance—the Council must adopt a "budget act" and proceed through the same "appropriations" process whether it requests additional funds or seeks a reduction of funds already appropriated. See Part III.C.2. supra. There is no distinct "unappropriations" process; nor would Congress pass a "supplemental unappropriations act." Consequently, in common parlance under the Home Rule Act, "appropriations" may signify a positive or a negative act.

When we look beyond the inconclusive language of the "laws appropriating funds" exception to its legislative history, two impressions stand out. First, proponents of the exception described its effect in broad terms, covering the roles of both the Council and Congress in the District's budgetary process. More specifically, in introducing the "laws appropriating funds" amendment to the original Charter Amendments bill, Council member Arrington Dixon said it "would place language in the Legislation that would prohibit initiative used against or as related to appropriated funds which go to tax levying or other forms of operating budget or appropriated fund actions." (Emphasis added.) Similarly, during the

congressional hearings on the Charter Amendments, District Delegate Walter E. Fauntroy explained, "House Concurrent Resolution 436 relates to initiative which is the process that allows electors to propose laws which will be voted on by them. This process of course excludes laws *relating to* the appropriation of funds." (Emphasis added.)

Second, during lengthy discussion of the "laws appropriating funds" amendment, Council members worried that an unqualified initiative right would enable the electorate to interfere with the fiscal affairs of the District. In particular, members expressed their concern that the initiative right would permit citizens to establish a program for which the Council then could be required to seek funding, regardless of the fiscal impact. Proponents of the amendment responded by distinguishing sharply between the power to authorize a substantive program, which the initiative right would confer on citizens, and the power to authorize expenditures, which the amendment explicitly reserved to the Council and Congress. Council members Marion Barry and Arrington Dixon made this point most clearly:

MR. BARRY: . . . .

This Council can place legislation authorizing the establishment of entities. We established the Office of Latino Affairs. We have also put into our budgetary process that to put in that measure some $50,000.

My interpretation is that is authorizing legislation and it is not appropriat[ing] legislation. That is, the Council in its budgetary process will decide to exclude the $5 million health center that the community had authorized us to build and operate, if during the budgetary process, the Council voted against it. That was my understanding in the Committee. That was my understanding from the staff, that authorizing legislation as we do but it wasn't appropriating legislation.

. . . .

MR. DIXON: It is correct on the initiative section. We passed it. The elector-

ate can initiate a tax if they want to, but they cannot appropriate that money. They can initiate any measure they want to initiate but they cannot initiate the spending of that money. That is not in their power to do.

In summary, the Council's deliberations show that the phrase "laws appropriating funds" encompasses both the Council's budget request acts and Congress' appropriations acts. The Council was particularly concerned, moreover, that the electorate not use the initiative to launch the appropriations process.

The Council, we note, did not specifically consider the converse situation presented in this case: an effort by the electorate to repeal or amend the substantive authorization for a funded project, to block the expenditure of previously appropriated funds, and to prevent future requests for appropriations. Nonetheless, in light of the Council's substantial concern about the fiscal effects of initiatives, in view of the language used by proponents to describe the broad impact of the "laws appropriating funds" amendment, and, especially because the "appropriations" process is necessary to accomplish rescissions as well as affirmative acts of funding, we do not believe the Council's failure to discuss the potential use of the initiative to halt a funded program is conclusive. We are bound to interpret the statute in the way most consonant with the overall intent of the legislature, even if the precise problem before the court was not expressly contemplated by the legislative body. *See Breen v. District of Columbia,* D.C.App., 400 A.2d 1058, 1061 (1979); *Eastern Air Lines, Inc. v. C.A.B.,* 122 U.S.App. D.C. 375, 378–79, 354 F.2d 507, 510–11 (1965).

In construing the amendment, we must weigh two major public interest concerns of the Council reflected in the Charter Amendments—the electors' right of initiative and responsible fiscal management—with a view to enhancing the value of each without undue intrusion on the other.

For perspective, it is interesting to note that, because of the significance and techni-

cality of financial decisions, many states have excluded such matters from the initiative right either by express statutory exception or, indeed often, by judicial interpretation.[39] On the other hand, the initiative right should be liberally construed. 5 E. McQuillin, *supra* § 1651, at 203–04. Courts, in fact, have applied the liberal interpretation rule with vigor in both procedural[40] and substantive contexts.[41] For example, in *Glass v. Smith*, 150 Tex. 632, 244 S.W.2d 645 (1951), the Texas Supreme Court stated in a well-considered opinion that it would impose on the initiative right only those limitations expressed in the law or "clear[ly] and compelling[ly]" implied. *Id.* at 637, 244 S.W.2d at 649.[42]

We conclude that the public interests in the initiative right and in responsible fiscal management are each achievable to the maximum extent, as intended by the Council, by interpreting the "laws appropriating funds" exception to bar any initiative that would halt a project—to the extent funds have been requested or appropriated—but to leave within the scope of the initiative

right the power to stop a project as of the end of the fiscal period for which funds have been requested or appropriated (or to stop it before the Council has requested funds). To use the *Glass* terminology, the Council's expressed concern about interference with the financial affairs of government, coupled with the fact that the appropriations process is used to rescind as well as approve funding, "clear[ly] and compelling[ly]" implies that the "laws appropriating funds" exception should be read to prevent the electorate from interfering with accomplished fiscal acts of the Council and/or Congress. The Council's clearly expressed concern, in adopting the Charter Amendments, that the initiative right received bifurcated treatment—distinguishing substantive authorizations from funding acts—indicates forcefully that the Charter Amendments do not sanction use of the initiative power to rescind the legislature's established fiscal plans.

Accordingly, we conclude that the "laws appropriating funds" exception prevents

**39.** *See, e. g., Thomas v. Bailey*, 595 P.2d 1, 2, 8 (Alaska 1979) (exception to initiative right for "mak[ing] ... appropriations" prohibits initiative to distribute land for homesteading); *State ex rel. Keefe, supra* 106 Fla. at 756, 145 So. at 175 (city charter's initiative and referendum rights do not extend to appropriations ordinances to carry out budget system); *Rauh v. City of Hutchinson*, 223 Kan. 514, 522, 575 P.2d 517, 522 (1978) (initiative and referendum rights do not permit popular vote on ordinances to carry out resolution authorizing bond issue); *Cuprowski, supra* 101 N.J.Super. at 28, 242 A.2d at 880 (in absence of clear mandate by legislature, appropriations and budget ordinances and resolutions are not subject to initiative or referendum); *Heider, supra* 37 Wis.2d at 480, 155 N.W.2d at 24 (initiative right does not extend to enactment of ordinance temporarily prohibiting expenditure of funds on high school addition); *Whitehead, supra* 204 Va. at 151, 129 S.E.2d at 696 (initiative right does not extend to calculation of expense factor in maintenance of public utility).

**40.** *See, e. g., Blotter v. Farrell*, 42 Cal.2d 804, 809, 270 P.2d 481, 483–84 (1954) (en banc) (initiative proposers were entitled to file supplemental petitions containing additional signatures); *State ex rel. Freeze v. Taylor*, 90 Mont. 439, 446–47, 4 P.2d 479, 481–82 (1931) (petition-signers may use ditto mark to indicate address); *State ex rel. Benham v. Cheever*, 71

Wyo. 303, 311, 257 P.2d 337, 341 (1953) (when initiative statute contains no provision requiring city to verify signatures on petitions, petitions received in evidence without objection constitute prima facie evidence of sufficiency, which city may rebut with evidence of invalidity or inaccuracy).

**41.** *See, e. g., Barnes v. City of Miami*, 47 So.2d 3, 6 (Fla.1950) (initiative right extends to question whether city should engage in public housing program under U.S. Housing Act); *State ex rel. Boyer v. Grady*, 201 Neb. 360, 368–69, 269 N.W.2d 73, 78 (1978) (initiative right extends to repeal of sales tax ordinance); *cf. Purser v. Ledbetter*, 227 N.C. 1, 9, 40 S.E.2d 702, 709 (1946) (city treasurer may not spend proceeds of property tax for recreation because voters must approve levy of taxes for other than necessary government expenses). *But see City of Lawrence v. McCardle*, 214 Kan. 862, 870, 522 P.2d 420, 427 (1974) (rejecting liberal construction rule in favor of practicality test, holds initiative to equalize firefighters' and police officers' pay is outside scope of initiative right).

**42.** The court accordingly permitted a popular vote on an initiative setting salary scales for the police and fire departments. *See Glass v. Smith, supra* 150 Tex. at 634–36, 244 S.W.2d at 647–48.

the electorate from using the initiative to (1) adopt a budget request act or make some other affirmative effort to appropriate funds, or to (2) block the expenditure of funds requested or appropriated as of the effective date of the initiative act.

The Council's fiscal concerns, however, do not compel the conclusion that the "laws appropriating funds" exception also should be read to preclude wholly prospective initiatives. A prospective funding freeze would not interfere with an adopted budget request act of the Council or an appropriations act of Congress; such an initiative would affect only future actions. Thus, it would not undermine the exercise powers of the Council and Congress to manage the financial affairs of the District. Furthermore, the Council's clear contemplation that the electorate could use the initiative to repeal legislation, see note 38 supra, strongly indicates that its fiscal concerns were present-, not future-oriented.[43]

Accordingly, we further conclude that the "laws appropriating funds" exception does not preclude initiatives (1) to establish substantive authorization for a new project (2) to repeal existing substantive authorization for a program (without rescinding its current funding) or (3) to prohibit future budget requests.

## B. The "Dixon Amendment"

In rejecting the CCRC initiative, the Board relied on the "Dixon Amendment" to the Initiative Procedures Act, D.C.Code 1980 Supp., § 1–1116(k)(7), which purportedly reflects the Charter Amendments exception to the initiative right for "laws appropriating funds," id. § 1–181(a). The trial court agreed that the CCRC initiative would "negate or limit" a budget request act of the Council. Id. § 1–1116(l). This is the specific decision brought to us for review.

As a preliminary matter, we must make clear that the "laws appropriating funds" exception constitutes an operative, substantive limitation on the initiative right. Although we stated in Convention Center I, supra, that the Charter Amendments are not self-executing, see id. at 552–53, that ruling held only that electors could not present initiative, referendum, or recall proposals until the Council established more specific procedures than the Charter Amendments themselves provided. See id. The decision did not hold that the substantive aspects of the Charter Amendments lack independent force. See Allison v. Washington County, 24 Or.App. 571, 576–80, 548 P.2d 188, 190–93 (1976) (en banc).

Although courts in other jurisdictions have excluded overly broad initiatives from the ballot even without specific statutory authorization, see note 17 supra, the Initiative Procedures Act specifically authorizes the Board, and if necessary the court, to withhold an initiative that is inconsistent with the Home Rule Act, including the Charter Amendments, or that would "negate or limit" a budget request act. See D.C.Code 1980 Supp., § 1–1116(k)–(l). Because we conclude that the Dixon Amendment comports with the Charter Amendment limitations on the initiative right,[44] the reliance of the Board and the trial court on that provision was entirely proper.

The Council enacted the Initiative Procedures Act as the enabling statute required by the Charter Amendments. See id. § 1–187. During consideration of the implementing legislation, Council Chairman Arrington Dixon introduced the so-called "Dixon Amendment" to reflect the Charter Amendments' limitations on both referendum and initiative rights. The provisions

**43.** A holding that the "laws appropriating funds" exception more broadly precludes an initiative to stop a program once the Council has requested a first round of funds for it would lead to the same result—at least with respect to the powers of the electorate—as that proposed in Chief Judge NEWMAN'S concurring opinion. We have rejected that position, see Part III.D. supra, and decline to bring it in through the back door by overextending the "laws appropriating funds" exception.

**44.** We express no view as to whether the "Dixon Amendment" properly reflects the limitations on the referendum right, D.C.Code 1980 Supp., § 1–181(b).

require the Board of Elections and Ethics to reject (as involving an improper subject) an initiative or referendum measure if "the petition presented would negate or limit an act of the Council of the District of Columbia pursuant to [D.C.Code 1978 Supp.,] section 47–224." *Id.* § 1–1116(k)(7); *see id.* § 1–1116(*l*); note 6 *supra.* On the basis of this provision, the Board and the trial court blocked the CCRC initiative measures.

As implementing legislation, the Initiative Procedures Act is valid, of course, only insofar as it conforms to the underlying Charter Amendments. These amendments to the District Charter, Home Rule Act, *supra* note 1, tit. IV, §§ 401–95; *see* note 5 *supra,* are in the nature of constitutional provisions, *see Washington Home Ownership Council, Inc., supra* at 1369 (Mack, J., with Newman, C. J. & Pryor, J., dissenting); 2 E. McQuillin, *supra* § 9.03, at 623, and cannot be amended or contravened by ordinary legislation. *See* D.C.Code 1978 Supp., §§ 1–124, –125, –128(a); 2 E. McQuillin, *supra* § 9.25, at 703.

■ In our view, the "Dixon Amendment," D.C.Code 1980 Supp., § 1–1116(k)(7), properly specifies certain limitations that the Charter Amendments place on the initiative right. *See id.* § 1–181(a). In barring any initiative that "would negate or limit [a budget request] act of the Council," D.C.Code 1980 Supp., § 1–1116(k)(7), the "Dixon Amendment" manifestly prohibits only initiatives that would contravene an existing budget request act. It does not appear to proscribe initiatives with a prospective fiscal effect only.

The legislative history reinforces that reading. In introducing the amendment, Chairman Dixon himself explained that it would not prohibit initiatives with a future orientation:

> I would also point out as a member of that committee and claiming in this discussion, I know personally the intent was not to talk about p[ro]spective limitations on review of possible proposed capital improvements or appropriation items. What we are speaking here, in the amendment that I offer, speaks about

these items that have already been acted on by this Council and have gone through the appropriations process. That is what this amendment speaks to.

> I am clear and sure that in the future there may be items that we may want to consider. This amendment is addressing those that have already started through the budget process and through the appropriations process. That is what we are speaking to.

The limitations specified by the "Dixon Amendment," therefore, are—to the extent relevant here—congruent with those inherent in the underlying "laws appropriating funds" exception. The Board and the trial court, therefore, properly acted in reliance on that Amendment.

## C. The Invalidity of the CCRC Initiative

■ Having established the substantive limitations on the initiative right, we turn to their application here. We agree with the decision of the Board and the trial court. We hold that the "Dixon Amendment," D.C.Code 1980 Supp., § 1–1116(k)(7), *see id.* § 1–1116(*l*), reflecting the "laws appropriating funds" exception to the initiative right, *id.* § 1–181(a), prevents CCRC's initiative from reaching the ballot.

As discussed in Part III.B.2 *supra,* the CCRC initiative (Initiative Measure No. 1) has both a substantive and a fiscal effect, as well as a present and a prospective effect. It would repeal the underlying substantive authorization for the construction and operation of the Convention Center. *See* D.C. Code 1973, § 9–220(a); *id.* 1980 Supp., §§ 9–601 to –610. It would bar further expenditure of appropriated funds and prevent future appropriations requests.

We have established in Part IV.A. *supra* that the "laws appropriating funds" exception permits initiatives with a prospective—but not a present—fiscal effect. Because the CCRC initiative would interdict the expenditure of currently appropriated funds, it is beyond the scope of the initiative power.

Furthermore, we have seen in Part IV.B., *supra*, that the Initiative Procedures Act, via the "Dixon Amendment," specifically authorizes the Board and the courts to withhold from a popular vote an initiative that is too broad in this respect. On this basis we halt the CCRC initiative here.

## V. CONCLUSION

In determining that the CCRC initiative proposes a "law," we confirm that the electorate and the District Council share coextensive legislative powers to halt a capital project, except to the extent that the Charter Amendments provide otherwise. In further concluding, however, that the CCRC initiative proposes a "law appropriating funds," and thus cannot lawfully be submitted to the voters, we confirm that the Charter Amendments bar the electorate from halting a capital project insofar—but only insofar—as the Council has requested and/or Congress has appropriated funds for it. To reiterate: the electorate cannot interfere, by way of initiative, with the legislatures' established fiscal plans. Finally, in stressing that the proposers of an initiative, the Board of Elections and Ethics, and the courts cannot reinterpret the CCRC initiative to meet the Charter Amendments' limitations, we underscore that the petition-signers' intentions, as reflected in the initiative measure and its summary, must be strictly followed. If we were to permit the revised intentions of the proposers to modify, after the fact, the specified intentions of the voters who signed the petitions, we would either be distorting the initiative procedure (by permitting the proposers to speak for the others who signed) or subjecting that procedure to our own speculation about what petition-signers would want to do under changed circumstances. We cannot properly do so.

## VI. POSTSCRIPT: RESPONSE TO DISSENT

By focusing almost entirely on an initiative "intended to stop construction of a

building" that substantially was funded and underway before the initiative right became effective, *post* at 926,[45] our dissenting colleagues oversimplify this case and mislead the public. They altogether overlook the crucial difference between the budgetary process and ordinary legislation under the Home Rule Act; they ignore the fact that there are five governmental bodies whose roles and prerogatives must be taken into account; and they decline to acknowledge that there are other contexts, not involving construction of an already-funded capital project, for which our opinion must anticipate exercise of the initiative right. The truth is, this court today confirms significant authority in the people to seek, by way of initiative, to bar future funding of a District project or program. It is a great disservice to suggest otherwise.

The Home Rule Act and its Charter Amendments grant a measure of governmental authority to each of three legislatures (the electorate, the Council, and the Congress) and to each of two executives (the Mayor and the President). In this case, therefore, we have had to interpret a unique and complex governmental structure and apply it to a situation that the Council, the electorate, and the Congress foresaw dimly—if at all—when they approved the Charter Amendments. It is the rule of the judiciary, through careful reading of the statute and its legislative history, extrapolation from the basic statutory structure, and due sensitivity to all the interests and prerogatives involved, to determine to the best of our ability what the Charter Amendments mean. Absent careful regard for each governmental body there is a danger that this decision inadvertently could distort the way our local government was designed to function.

It is therefore important to stress, first, where the court agrees. Seven judges (represented by the plurality and dissenting opinions) appear to agree that congressional

---

**45.** This court has held, in an opinion written by Judge GALLAGHER, that the Charter Amendments conferring the initiative right were not

self-executing; they required implementing legislation. *See Convention Center I, supra* at 552–53.

funding of a locally enacted program—whether a capital project or some other, ongoing activity—does not preclude the Council from changing its mind and seeking to halt the program through a "budget request act" asking Congress to rescind the appropriation. The fact that Congress already has appropriated funds for a local program, to be administered by the Mayor, does not tie the Council's hands. We seven agree, therefore, that in seeking to halt a funded project, the Council would not impermissibly interfere with the legislative prerogatives of the Congress or the executive functions of the Mayor. *Ante* at 902–911; *post* at 922.

Those of us who agree on this division of authority between Congress and Council, and Council and Mayor, do not agree, however, on the extent to which the electorate, by use of the initiative, can stand in the Council's legislative shoes. All seven judges (indeed, all nine) do agree that the Charter Amendments' exception barring initiatives for "laws appropriating funds" prohibits the electorate from attempting to fund an authorized program. *Ante* at 913–914; *post* at 926. All seven also would agree, on the other hand, that the Act at least permits the electorate to try to halt a project through an initiative to bar funding *after* current appropriations have expired. *Ante* at 913–915; *see post* at 927.[46] Seven of us, therefore, disagree only on the narrow question—determinative here—whether the electorate also properly can attempt to halt a project by passing an initiative to freeze funds that the Council already has requested or Congress appropriated. The dissenters say yes; we say no. Because the initiative at issue here attempts to reach funds already appropriated for the Convention Center, we conclude it cannot reach the ballot.[47]

Our dissenting colleagues make one basic criticism of our analysis. They say that the "laws appropriating funds" exception to the initiative right should be construed simply as a bar against citizens initiating a "budget request act." More specifically, they assert, "[t]he plurality avoids the plain meaning of [the] 'laws appropriating funds'" exception to the initiative right. *Post* at 924. The court can resolve the question, they say, "[i]f we simply translate 'laws appropriating funds' as 'budget request acts,'" so that the Home Rule Act clearly will "say[ ] only that *the people may not, by initiative, themselves propose a budget request act.*" *Post* at 924 (emphasis in original). This solution is not as simple, let alone persuasive, as it may sound.

In the first place, despite their purported reliance on the "plain meaning" of the Home Rule Act language, even the dissenters cannot make sense of the phrase "laws appropriating funds" without sliding over the fundamental distinction between a "budget request" by the Council and an "appropriation" by Congress, then equating the initiative right here with initiatives under the simpler governmental structures of the states, and finally quoting at length from legislative history, in order to support their interpretation of "plain meaning." The dissenters, just like all other members of the court, had to probe the Act, its history, and the case law for an answer.

Second, and more significantly, on the basis of "[a] thoroughgoing analysis" of legislative history, *post* at 925, the dissent concludes that "the 'laws appropriating

---

**46.** All nine members of the court agree that the electorate can seek to authorize—or deauthorize—a project or program by initiative (subject to congressional layover). *Ante* at 914; *post* at 920, 927. Although a deauthorization itself could have the effect of barring future budget requests and appropriations, and thus halting initial or further funding of a project, we have explained that deauthorization alone cannot stop expenditure of funds already appropriated. Only the separate budgetary process can achieve that result. *Ante* at 904–

906; *post* at 920 n.* At no point do the dissenters discuss, let alone refute, this fundamental point.

**47.** Our dissenting colleagues apparently agree that the proposed initiative would reach appropriated funds. *Post* at 926–927. They do not quarrel with our conclusion that the proposers, the Board of Elections, and the court cannot properly make postcirculation revisions to give the initiative only a prospective effect. *Ante* at 900–902.

funds' exception was designed . . . to assure that the Council retained the ultimate *fiscal responsibility*. . . . The Council was insistent . . . that those budgetary tasks should remain exclusively its own." *Post* at 926 (emphasis in original). The dissent also acknowledges the legitimacy of those concerns. "The reasons for [the 'laws appropriating funds'] prohibition are sensible and obvious. The electorate should scarcely be permitted to function as surrogate comptrollers." *Post* at 926. The dissent's analysis accordingly reinforces our own conviction that the Charter Amendments to the Home Rule Act, reflecting concern about interference by the electorate in the appropriations process, cannot properly be interpreted to permit the electorate to undo accomplished fiscal acts of the Council and Congress. *Ante* at 911–914.

Third—and most telling—the dissenters are caught in a fatal inconsistency. They interpret the "laws appropriating funds" exception to mean that the electorate is forbidden to use the initiative only to *seek* funds for a project; thus, as the dissenters see it, the electorate is permitted to use the initiative to *halt* expenditure of funds already appropriated for a project. In drawing this line, however, the dissent fails to take account of a significant feature of the Home Rule Act: the process for making appropriations, beginning with a budget request act, is the very same process that also must be used to rescind them. *Ante* at 905–907. Therefore, if it is true—as the dissent acknowledges—that "*the people may not, by initiative, themselves propose a budget request act*," *post* at 924 (emphasis in original), then they may not, by initiative, propose a budget request act either to fund a program *or to halt program funding* in the course of a fiscal year. *Ante* at 913.

Moreover, in overlooking the necessary use of budget request (and appropriations) acts for rescinding as well as enacting appropriations, the dissent ignores the key role of Congress in the budget process. If, as the dissent suggests, the electorate, by initiative, could halt accomplished funding for a project at any time without going through the budget process, *post* at 926–927, the dissent apparently contemplates that mere ordinary legislation by the Council or an initiative by the electorate—subject only to a 30-day congressional layover—could undo appropriations and impound funds in the hands of the Mayor. This proposition, for which no authority is cited, clashes with the Home Rule Act requirements that Congress give affirmative approval in fiscal matters. *Ante* at 905–906.

In summary, the dissenters' entire argument is built upon a false premise: that appropriated funds can be frozen without resort to the budgetary process. Not even the Council can do that. There is no basis whatsoever for concluding that the electorate has greater power than the Council. The fallacy of the dissenters' position, therefore, is evident: they admit that the people, by initiative, cannot propose a budget request act; and yet they cannot get around the fact that this is the very type of act required to halt as well as seek appropriated funds. Indeed, we agree with the dissent: "The power to pass budget requests (and supplemental budget requests) and transmit them to Congress remains exclusively with the D.C. Council and the Mayor." *Post* at 925.

To reiterate: we have concluded that the electorate, by initiative, can seek to deauthorize and bar future funding of a District program or project. Thus, in the days ahead, if the electorate wishes to preclude a new operating program or to bring an existing one to a halt, it can initiate legislation to do so—as long as it does not interfere with already appropriated funds. Once the electorate learns of plans for a capital project, such as the Convention Center, moreover, it has the ability to initiate legislation to stop the project in a timely, cost-effective way before the District has broken ground. It is only the timing of events here that may obscure this central truth. Although this particular initiative fails because it seeks to interdict current funding for the Convention Center, one should not lose sight of the fact that the Council had requested the first appropria-

tions for that project almost one year before the initiative right went into effect. If the initiative right had existed earlier, the effort to stop the Convention Center might have come to a different conclusion.

The outcome of this case, therefore, should not detract from the importance of the electorate's legislative authority for the future. Nor should the urgency of the Convention Center initiative—using a new legislative process directed at a project already on the move—justify a judicial shortcut (which in effect the dissenters propose) to help the petitioners catch up with events. Too much in the long run is at stake.

*Affirmed.*

## APPENDIX A: INITIATIVE MEASURE NO. 1

INITIATIVE MEASURE NO. _____

*Proposer: John J. Phelan*

### BY THE ELECTORS OF THE DISTRICT OF COLUMBIA

To prohibit the District of Columbia Government from using public funds to construct or operate a Convention Center designed primarily to house business conventions and trade shows.

BE IT ENACTED BY THE ELECTORS OF THE DISTRICT OF COLUMBIA, That this measure may be cited as the "Convention Center Initiative of 1979."

Sec. 1. *Findings and Purpose.*

The electors of the District of Columbia find that the Convention Center, which has been proposed at a cost of approximately $100 million and which will be designed to house business conventions and trade shows, would benefit primarily hotels and other businesses in the District of Columbia. Because the present proposal is to finance the Convention Center primarily from public funds appropriated by Congress, derived from taxes, borrowed or otherwise acquired, the electors of the District of Columbia find that the construction of the Convention Center would not be in the best interests of the citizens of the District of Columbia, and

therefore adopt this law to prohibit the construction of such a facility.

Sec. 2. *Definition of Terms.*

(a) "Convention Center" is defined to include the structure which has been designed primarily to house exhibits for business conventions and shows in the approximate area bounded by 11th Street, N.W., New York Avenue, N.W., 9th Street, N.W., and H Street, N.W.

(b) "District of Columbia Government" means City Council of the District of Columbia, Mayor of the District of Columbia, and any other District of Columbia instrumentality agent, employee, contractor, or employee of a contractor, who is authorized by law, including by contract, to spend public funds appropriated by Congress, derived by taxes, borrowed or otherwise acquired for public use by the governing officials of the District of Columbia, and to designate District of Columbia land for public or private use.

Sec. 3. *Prohibition Against the Use of Public Funds for the Construction or Operation of a Convention Center.*

After the effective date of this measure, the District of Columbia Government shall not construct or operate a Convention Center, or acquire land for that purpose.

Sec. 4. *Provision for Disposition of Property Acquired for the Convention Center and for Termination of Pending Contracts.*

As soon as practical after the effective date of this Act, the Mayor and City Council of the District of Columbia shall cancel all pending contracts for the construction of the Convention Center, paying whatever penalties or making whatever adjustments are required by law, shall terminate any ongoing proceedings to acquire land for the Convention Center, and shall devise a plan for the disposition of any land acquired for the construction of a Convention Center. Ninety days after the enactment of this Act, and every 180 days thereafter until all contracts had been terminated and all land dispositions have been made, the Mayor shall report to the Council and the public on the progress which has been made toward

settling all Convention Center construction contracts and disposing of all land acquired for the construction of the Convention Center.

Sec. 5. *Provision Making the Law Self-Executing.*

This law constitutes a mandate of the public and shall be deemed to be self-executing.

Sec. 6. *Severability Clause.*

If any section or provision of this measure is held to be invalid, such invalidity shall not affect the remaining provisions.

Sec. 7. *Effective Date.*

This measure shall become effective in accordance with Section 5 of Public Law 95–526 § 1(3) amending the Initiative, Referendum, and ·Recall Charter Amendment Act of 1977 (D.C. Law 2–46), and section 602(c) of the District of Columbia Self-Government and Governmental Reorganization Act.

### APPENDIX B: INITIATIVE MEASURE NO. 2

Proposed Text,

INITIATIVE MEASURE NO. ———

### CONVENTION CENTER INITIATIVE OF 1979

The Mayor and the Council of the District of Columbia shall not provide any further tax revenues or any other considerations from public funds, the Federal payment, incur any debt or provide public property, after the effective date of this law, to purchase land, construct and/or operate a convention/civic center.

### APPENDIX C: INITIATIVE MEASURE NO. 3

Proposed Text—August 6, 1979

INITIATIVE MEASURE NO. ———

### CONVENTION CENTER INITIATIVE OF 1979

The Mayor and the Council of the District of Columbia shall not provide any further

tax revenues or any other considerations from public funds, the Federal payment, incur any debt or provide public property, after the effective date of this law, to purchase land, construct and/or operate a convention/civic center.

*Definitions:*

(a) "Provide" shall mean:

(1) in the case of "tax revenues," the "Federal payment," and "other considerations from public funds," funds in a future District budget, but shall not include District budgets approved by Congress prior to the effective date of this Act;

(2) in the case of "public property," property acquired with funds authorized in a District budget approved by Congress after the effective date of this Act, but shall not prohibit the District from designating property for a convention/civic center if that property was acquired with funds authorized in a District budget approved by Congress prior to the effective date of this Act specifically for a convention/civic center.

(b) "Incur any debt" shall mean any authority in a future District budget to ·incur debt for a convention/civic center, but shall not prohibit the District from incurring debt for a convention/civic center to the extent authorized in a District budget approved by Congress prior to the effective date of this Act.

NEWMAN, Chief Judge, with whom PRYOR,. Associate Judge, joins, concurring:

I am unable to join the opinion of Judge Ferren.

I agree that the City Council could, by enacting a "law" within the meaning of D.C.Code 1979 Supp., § 1–181(a), amend D.C.Code 1973, § 9–220(a) to pro tanto repeal the capital project authorization legislation so as to exclude authorization for the Convention Center. I agree that the citizens, by initiative, could do likewise.*

---

* The practical effect of a repeal of authorizing legislation may be to stop an ongoing capital

project. However, this is not necessarily so. There is nothing, except its own rules, which

Now to the areas where I view Judge Ferren's opinion as plainly wrong. I am satisfied that neither the Council nor the citizens can prohibit the expenditure of congressionally appropriated funds. The basic rationale for my view on this question is set forth in the opinion I authored in this case for a division of this court, which was vacated when we went en banc. That opinion is being published at 441 A.2d 871, simultaneously with this en banc decision. Likewise, based on the rationale of that opinion, I am of the view that a budget request by the District of Columbia, which is transmitted to the Congress as part of the President's budget for congressional consideration under its powers in Article I of the Constitution is *not* a "law" within the meaning of D.C.Code 1979 Supp., § 1–181(a), and that the citizens, by initiative cannot prohibit, modify or repeal such a budget request. .

I thus concur in the results reached, *i. e.*, the initiative proposed by Convention Center Referendum Committee, in all the various permutations, was properly rejected both by the Board of Elections and by Judge Ugast.

GALLAGHER, Associate Judge, Retired, with whom KERN, NEBEKER, and HARRIS, Associate Judges, join, dissenting:

If the people of this city think that just because their Charter gives them the right to vote by initiative on legislation properly proposed by the citizenry[1] this right will be enforced by this court, they will now know better. In a touch of irony, the majority today votes for a voteless District of Columbia—on this major question of public policy.

A group of 15,000 petitioners has been trying since October, 1978 to exercise their Charter given right and now, almost three years later, in opinions resting on convoluted reasoning which can only be described as resentful of the attempt, the citizenry now learns the voting right they thought they had under the Charter was only an illusion. In an unsuccessful effort to ward off this illiberal decision, two Councilmembers—one represented by the American Civil Liberties Union[2]—entered the case as amicus curiae at the en banc stage to warn against this denial of civil rights by the court. Counsel for the American Civil Liberties Union told the court the issue

> goes to the integrity of our government because it involves the right of the citizens to vote on a major question of public policy .... At stake ... is an essential part of the self-government that was restored to residents of this city in the last few years after a century of disenfranchisement.

I agree with that assessment. We should enforce the Home Rule Charter as it is plainly written. I do not subscribe to the sophomoric view that whenever the prestige of the new Home Rule government is perceived to be at stake this court should abdicate its rightful judicial function and somehow find a way to support City Hall—no matter how far-fetched the reasoning. That is not the stuff that strong and enduring governments are made of in this country. It is one thing for a fledgling government to falter and deprive fundamental Charter rights in the process of finding its way toward political maturity.[3] It is quite

prevents Congress from appropriating in the absence of authorizing legislation. *See* note 28, *supra* of Judge Ferren's opinion.

1. Except the people may not legislate appropriations, for obvious reasons. I later discuss this.

2. The American Civil Liberties Union is appearing here in the role of counsel for Councilmember Mason.

3. An informed commentator on the local scene astutely observed recently:

> The elections board must be careful about undoing the will of voters who petition to place an issue on the ballot, especially when elected city officials—including the mayor who appointed the members of the elections board—have publicly promised to oppose the initiative. The referendum process was designed to give voters some mechanism for creating law without interference from elected officials. The election board's decision to take the tax initiative off the ballot therefore comes close in appearance to being a political decision.
> \*　\*　\*　\*　\*　\*

another matter for this court to do so, being an institution tempered by forty years of decision-making, with every reason to be free from political pressures, and with the judicial traditions and experience of two centuries at our elbow to consult continually. For the court, there is no excuse. We are expected to be enlightened, dispassionate, and guided by reason and experience.

Instead, what we have here is a decision by the court fashioned entirely to support the other branches of government. In doing so, the majority has lost sight of the judicial function, with the result that it has dealt a gratuitous blow to *true* Home Rule government.

## II

The two opinions for the majority take different courses to reach the same result. Chief Judge Newman's opinion reaches its conclusion by vesting rather alarming legislative powers in the Mayor.[4] Judge Fer-

A clear line of sufficient cause is a must if the board is to avoid the suspicion that it is subject to political pressure on initiatives that do not please the powers-that-be in the District Building. [Editorial], The Washington Post, Aug. 5, 1981, § A at 22.

4. That the Mayor has no such powers as bestowed upon him in Chief Judge Newman's opinion was previously made clear in this colloquy at a Senate hearing, at which then Chairman Leahy stated:

Congress, of course, did not mandate a convention center, but rather authorized a convention center, and authorized the city, if they determined this is what they wanted to do, to do it within certain budgetary limits. But I think *Congress made itself clear that its involvement was solely on the upside budgetary limit,* design and location. *Whether to go forward with it was entirely up to the city.* That was certainly my understanding. [*District of Columbia Appropriations for Fiscal Year 1980; Hearings before a Subcomm. of the Senate Comm. on Appropriations,* Pt. II, 96th Cong., 1st Sess. 959 (1979) (emphasis added).]

Senator Leahy was also informed by counsel for the CCRC of the argument that

the District['s] hands were tied, *even if the City Council changed its mind on the convention center, they would argue they would have no authority to implement that change of mind. They are arguing that they are required to borrow and spend the money and go through with the project including re-*

ren's plurality opinion,[5] on the other hand, disputes rather vigorously that approach[6] and instead finds another avenue to decision.

I agree with Part III of Judge Ferren's opinion where, in net effect, he concludes that a law is a law—including the one before us. But that is the limited extent of my agreement with his opinion.[7]

## III

Before commencing a discussion on the merits of the issues, I would like to make a few preliminary comments.

There is an undercurrent to both majority opinions that initiatives (or referenda) interfere with the executive and legislative branches of government and, consequently, should be restricted as much as possible. The majority seems not to appreciate the history and purposes of initiative and referenda in this country. The fact is, initiatives and referenda are by their nature *intended*

*questing future appropriations.* [*Id.* (emphasis added).]

To this, Chairman Leahy commented:

This is an interesting argument, but *I doubt any of the 535 Members of Congress would agree.* [*Id.* (emphasis added).]

5. Judge Ferren is joined by Judges Kelly and Mack, which constitutes a plurality of the five judges favoring affirmance.

6. Chief Judge Newman's panel opinion led Councilmember Betty Ann Kane to appear before the en banc court as amicus curiae because of the denigration of the Council's legislative authority present in that opinion, which incidentally is now abandoned by the plurality.

7. In the "Response to Dissent," the plurality sets forth what it deems to be areas of agreement between the plurality and dissenting judges. The dissenters find those particular statements either confusing or contrary to the views of the dissenting judges. Consequently, it is only accurate to say that the dissent's area of agreement with the plurality is as I have stated. As I read the "Response to Dissent," it amounts to a series of "cleverisms" about a basic Charter right, which does not permit of this. Contrary to the plurality, for exercise of the right it does not matter what month it is, nor what season it is, nor at what stage is the budget or appropriations process. It is a right for all seasons.

to interfere with elected officials on specific public issues. The right to do so was reserved to the people precisely for the reason that they might on occasion conflict with decisions taken (or not taken) by government. See generally Munro, The Initiative, Referendum and Recall. Needless to say, it is not permissible for the electorate to abuse this reserved power—such as by harassing the two branches of government or impeding the orderly general administration of government. See, e. g., State ex rel. Ballantyne v. Leeman, 149 Neb. 847, 858, 32 N.W.2d 918, 923 (1948); Ruano v. Spellman, 81 Wash.2d 820, 823, 505 P.2d 447, 449 (1973) (en banc).

I scarcely need to say that this case has nothing to do with whether a Convention Center in this city is desirable. It probably is a very worthwhile endeavor. But this is not for the court to consider. The sole question before us relating to a Convention Center is whether three years ago, before construction was started, the voters should have been accorded their right to vote—as expressly granted in the Charter—on whether the Center should be constructed. At this late date the Convention Center is well on its way to completion with construction funds appropriated or otherwise raised. Consequently, in one sense we are now talking about a moot topic. Few people would vote to tear down the structure. But we are by no means talking about a moot subject when we discuss whether this court will guard voting rights expressly granted to the citizenry of the capital of the country in their Charter. This is the underlying issue of the case.

Concluding these preliminary observations, I might comment that almost every informed person in local affairs knows the purpose of the initiative was to repeal the legislative decision to construct the Convention Center. The Convention Center Referendum Committee (CCRC) has been trying persistently for several years to take this issue to the people, but it has been thwarted

at every turn. The group was first told it was too early—the governing laws were not yet in place.[8] Now it is told it was too late.

Senator Leahy, then in the highly authoritative position of Chairman of the Senate Subcommittee on Appropriations, had this to say during a hearing on the unfortunate history of the attempts to obtain this initiative on the Convention Center:

> I have had a large number of Senators express to me that they were surprised to see the initiatives get blocked.... [A] lot of Senators were quite surprised that this happened. These were Senators strongly in favor of home rule, and they indicated they were surprised that one of the biggest aspects of home rule, the initiative aspect, was blocked.
>
> I make this point for whatever it is worth, I was surprised, too.
>
> \* \* \* \* \* \*
>
> \* \* \* I wish they had done otherwise, and allowed the referendum to go forward. But that is a decision they have made, and ... I don't think this committee could or should reverse, but rather simply watch what happens next in the court procedures. [District of Columbia Appropriations for Fiscal Year 1980: Hearings before a Subcomm. of the Senate Comm. on Appropriations, Pt. II, 96th Cong., 1st Sess. 959–60 (1979) (emphasis added).]

Turning from this unpleasant bit of history, and focusing on the plurality opinion, it says the effort of the voters for an initiative must fail for these reasons:

1. The Charter expressly creates an exception to the initiative right, i. e., electors may not propose "laws appropriating funds." D.C.Code 1979 Supp., § 1–181(a).

2. The so-called Dixon Amendment (D.C.Code 1980 Supp., § 1–1116(k)(7)) validly prohibits the proposed initiative.

I will devote myself to the two prongs of the plurality opinion and, most of all, to the result being reached by the court.

---

8. *Convention Center Referendum Committee v. Board of Elections and Ethics*, D.C.App., 399 A.2d 550 (1979).

## IV

The principal question raised by the plurality opinion revolves around the meaning of familiar English words constituting a single phrase, "laws appropriating funds." We all seem in agreement that if the so-called Dixon Amendment, which states that an initiative may not "negate or limit" a budget request act, is not a valid implementation of this Charter Amendment language, then the Dixon Amendment is void. It is not necessary to reiterate that a statute cannot materially amend a constitution. Little need be said at this juncture about the intent of the Dixon Amendment itself, for that intent is clear. Our first task is to explain what the Charter language, "laws appropriating funds," means.

We ought to be guided by two "first principles." The first is ostensibly recognized by the plurality: charter grants of authority for the exercise of the initiative and referendum are to be liberally construed. *Blotter v. Farrell,* 42 Cal.2d 804, 809–10, 270 P.2d 481, 484 (1954) (en banc); *State ex rel. Boyer v. Grady,* 201 Neb. 360, 364, 269 N.W.2d 73, 76 (1978); 5 E. McQuillin, Municipal Corporations § 16.51 at 203–04 (3d rev.ed.1979). Being reservations of power *to the people,* the court should strive to effectuate, not thwart, their purpose. *Citizens Against a New Jail v. Board of Supervisors,* 63 Cal.App.3d 559, 561, 134 Cal. Rptr. 36, 37 (1977); *Bayless v. Limber,* 26 Cal.App.3d 463, 468, 102 Cal.Rptr. 647, 649 (1972); *Klosterman v. Marsh,* 180 Neb. 506, 512–13, 143 N.W.2d 744, 749 (1966). The plurality opinion gives a passing nod to the doctrine that the initiative provisions of the Charter must be liberally construed and that is the end of it. The opinion then goes on to discuss the attempt to exercise the right of initiative—while conjuring procedural obstacles to deny it. A case on voting rights is no place for technicalities.

The second starting principle is that the first step in construing any document of legal import is to look at the plain meaning of the words. *See Davis v. United States,* D.C.App., 397 A.2d 951, 956 (1979); *United States v. Young,* D.C.App., 376 A.2d 809, 813 (1977). *See also Greyhound Corp. v. Mt. Hood Stages, Inc.,* 437 U.S. 322, 330, 98 S.Ct. 2370, 2375, 57 L.Ed.2d 239 (1978). This is especially true when what is being construed is a charter (*i. e.,* constitutional) amendment which is of force today only because the *people* approved it, *as written,* in a popular referendum.

The provision in question states:

The term "initiative" means the process by which the electors of the District of Columbia may propose laws (except laws appropriating funds) and present such proposed laws directly to the registered qualified electors of the District of Columbia for their approval or disapproval. [D.C.Code 1979 Supp., § 1–181(a).]

Now that seems plain enough. The electors may propose laws, except that they may not propose laws appropriating funds. The electors here did not propose an appropriation law. They proposed that a Convention Center be not constructed. This is the opposite of enacting an appropriations law. Only one bent on some other mission would find this to be a proposal for an appropriation of funds. Does it have an impact on a prior appropriation? Everything in government costs money and all legislation has some sort of an impact on the budget, including the recent gambling initiatives which have sailed through to a vote, unmolested.

The plurality avoids the plain meaning of "laws appropriating funds" by asserting, with seeming despair, that the phrase is too ambiguous for the unassisted mind to comprehend. The only question identified by the plurality, however, arises from the fact that, under the Home Rule scheme, the Council passes only "budget request acts," not "laws appropriating funds." If we simply translate "laws appropriating funds" as "budget request acts," the only sensible thing to do, then the Charter language says only that *the people may not, by initiative, themselves propose a budget request act.* The unmistakable meaning of the term is that the people may not by initiative enact an appropriations law (or transmit a budget request to Congress). It can hardly be stated any simpler.

Numerous states have similar provisions prohibiting "laws appropriating funds" in relation to initiatives [9]—for the same reason our Charter contains this exception. The reason is voters are not immersed in day-to-day government so as to be able to make reasoned judgments on the complex financial management of government, *e. g.*, the interplay of various appropriations on a budget. The voters do not qualify as comptrollers. Apparently, when the exception was being drafted in this jurisdiction the drafter—as is commonplace in legislative drafting—simply borrowed the phrase from the laws of one of these states and omitted to adapt the phrase to the unusual legislative situation in the District of Columbia. By this I mean, the phrase was not translated further into the "budget request act" terminology of the appropriations process in the District of Columbia. But the meaning of the term "laws appropriating funds," as applied in this jurisdiction, is perfectly plain. This is especially true if one sets out with an open heart and a generous spirit to construe the Charter.

In an Appendix to my dissent, however, I set forth as a matter of interest the legislative history of the statute. This will demonstrate the circumlocutions engaged in by the plurality opinion in construing it. A thorough-going analysis of the Council's deliberations shows that the sole intent of the "laws appropriating funds" exception was to make clear that the electorate may not by initiative, itself propose an actual budget request act in order to execute its wishes. The power to pass budget requests (and supplemental budget requests) and transmit them to Congress remains exclusively with the D.C. Council and the Mayor.

The plurality opinion states this:

The Council, we note, *did not specifically consider the converse situation* presented in this case: an effort by the electorate to repeal or amend the substantive authorization for a funded project, to block the expenditure of previously appropriated funds, and to prevent future requests for appropriations. Nonetheless, in light of the Council's substantive concern about the fiscal effects of initiatives, in view of the language used by proponents to describe the broad impact of the "laws appropriating funds" amendment, and especially because the appropriations process is necessary to accomplish rescissions as well as affirmative acts of funding, *we do not believe the Council's failure to discuss the potential use of the initiative to halt a funded program is conclusive. We are bound to interpret the statute in the way most consonant with the overall intent of the legislature even if the precise problem before the court was not expressly contemplated by the legislative body. See Breen v. District of Columbia*, D.C.App., 400 A.2d 1058, 1061 (1979); *Eastern Airlines, Inc., v. C.A.B.*, 122 U.S.App.D.C. 375, 379, 354 F.2d 507, 511 (1965).

*In construing the amendment, we must weigh two major public interest concerns of the Council reflected in the Charter Amendments—the elector's right of the initiative and reasonable fiscal management—with a view to enhancing the value of each without undue intrusion on the other.* [Emphasis added.]

By this device, the plurality sets itself up as the super-legislature. Among other things, it would establish the court as the self-appointed decider of "reasonable fiscal

9. *E. g.*, Alaska Const. art. XI, § 7 ("The initiative shall not be used to . . . make or repeal appropriations. . . ."); Mass.Const. amend., art. 48, Init., pt. 2, § 1 ("No measure that . . . makes a specific appropriation of money from the treasury of the commonwealth, shall be proposed by an initiative petition. . . ."); Mo. Const. art. 3, § 51 ("The initiative shall not be used for the appropriation of money other than of new revenues created and provided for thereby. . . ."); Mont.Const. art. 3, § 4 ("The people may enact laws by initiative on all matters except appropriations of money . . . ."); Nev.Const. art. XIX, § 6 ("This article does not permit the proposal of any statute or statutory amendment which makes an appropriation or otherwise requires the expenditure of money, unless such statute or amendment also . . . provides for raising the necessary revenue."); Wyo.Const. art. 3 § 52(g) ("The initiative shall not be used to . . . make or repeal appropriations. . . .").

management." [10] This is a giant leap into a judicial morass—to say nothing of an invasion of the legislative function of government. It is judicial activism run amok. [11]

Contrary to the plurality's "impressionistic" construction, the "laws appropriating funds" exception was designed not to prohibit *fiscally irresponsible* initiatives but to assure that the Council retained the ultimate *fiscal responsibility.* The Council's deliberations show it accepted the fact that the new Charter rights might at times complicate its budgetary decisions. The Council was insistent, however, that those budgetary tasks should remain exclusively its own.

The plurality's conclusion is that the "laws appropriating funds" exception prevents the electorate from using an initiative to block the spending of money already requested or appropriated. The purpose of statutory construction is to make sense of the provision being interpreted. *See United States v. Katz,* 271 U.S. 354, 357, 46 S.Ct. 513, 514, 70 L.Ed. 986 (1926). The plurality violates this. *Cf. Rick v. United States,* 82 U.S.App.D.C. 101, 103, 161 F.2d 897, 899 (1947) ("[It is a] well-established rule of construction [that a court may not] construe a statute in such manner as to make it patently ridiculous.") They agree, as they must, that an initiative may effect a repeal of legislation. But the plurality, in its new and dubious role as the guardian of "fiscal responsibility" in the government, will permit an initiative which is intended to stop construction of a building to take effect only after funds already requested or appropriated for the building have already

been spent. This is hardly fiscal responsibility. Needless to say this rationale prevents the present initiative. But it presents a poor case for statutory construction based on common sense.

The plurality would permit a repealer initiative to deauthorize a program, but only before the Council has adopted a budget request act or as of the expiration of funds appropriated for it; or it may prohibit future budget requests. When this is translated into the real world of government, it is unacceptable. We should not enter into a "dreamed up" interpretation of a voting rights statute whereby, if a capital project has been approved and the appropriations process is underway, an initiative to repeal the legislation must await the pouring down the drain of millions of dollars before becoming effective. Not only is this unfortunate bit of judicial legislation not compelled, it is unwarranted. [12]

All that the "laws appropriating funds" exception actually means, in the concrete, is that the people may not seek, through the initiative, to propose and pass an actual budget request act. The reasons for that prohibition are sensible and obvious. The electorate should scarcely be permitted to function as surrogate comptrollers. Thus, as the Council's deliberations on the Charter Amendments make clear, the people may, by initiative, authorize a capital project and even direct the Council to request the necessary funding from Congress. The electorate may not, however, take the step of passing and transmitting its own budget request act to Congress. Similarly, the vot-

---

**10.** One may wonder how the plurality would have the court go about deciding in the future the "fiscal responsibility" of such political issues as "deficit spending," issuance of municipal bonds, etc., in determining whether they would conform with "responsible fiscal management." The plurality view would be a judicial boomerang. This is not the court's business. It has all it can manage to decide litigable issues before it on the factual records presented.

**11.** I find it curious that in commenting on this dissent, the plurality opinion states:

> By focusing almost entirely on [the issue of this case] . . . our dissenting colleagues oversimplify this case and mislead the public. We are obviously at odds on this point, but I am under the impression that the first duty of any court is to decide the issue being litigated before it.

**12.** To get there, the plurality engages in a bit of legerdemain so as to reach the conclusion that "opposing" a law appropriating funds is the same as "proposing" one. This feat is necessary so as to bring the instant initiative, which seeks to deauthorize a project, into the plurality interpretation of the "laws appropriating funds" exception.

ers may seek, by initiative, to *deauthorize* a capital project and, in substance, direct the government to take steps to wind it up. This is exactly what the petitioners did here. Their petition was not a supplemental budget request act. This interpretation of "laws appropriating funds" seems simple enough. Constitutions (charters) are not meant for the niggling reading given by the plurality. They do not endure well if, when interpreted, they are overwhelmed with suffocating semantics.

*Dixon Amendment*

The Dixon Amendment was prompted by the existing threat of a vote by initiative on whether the Convention Center should be constructed. The Amendment was intended to foreclose an initiative on this project. The legislative history makes this clear. At the first reading of the Initiative Referendum and Recall Procedures Bill—one week before Dixon introduced his amendment—Councilmember Hilda Mason offered an amendment specifically designed to exempt the Convention Center petition from certain

of the formal and procedural requirements set up by the bill. [R. CA 8368–79 at 39, Pl.Ex.E at 18–21.] Despite Chairman Dixon's opposition to the amendment,[13] it passed by a vote of seven to five. At the Council's next meeting, and while the Convention Center Citizens Committee was trying to move forward on the initiative vote, Chairman Dixon offered his so-called Dixon amendment:

MR. DIXON: * * *

I would like to, at this time, introduce another amendment, which I would like to be circulated. I would offer an amendment to the Initiative, Referendum and Recall Procedures Act. This particular amendment does deal with the concern for the approval of capital projects. It is our feeling that the intent of the legislation from the Corporation Counsel is that the initiative, referendum and recall language was not designed to deal with capital or approved budget items.

I would move the amendment at this time. Could we circulate them, please.

---

13. Interestingly, at no time in his statement opposing the Mason Amendment [R. CA 8368–79 at 39, Pl.Ex.E at 31–35] did Chairman Dixon even suggest that he viewed the Convention Center initiative as contrary to the Charter Amendments because it proposed a "law appropriating funds." Rather, Dixon's only complaint was that the Mason Amendment operated in an *ex post facto* manner by excusing the Convention Center petition's failure to comport strictly with the procedures to be set up by the Initiative Referendum and Recall Procedures Act. He also made no secret of his view that the Convention Center initiative was an attempt by a minority to subvert the will of the people as expressed in the Council's decision to build the Convention Center.

CHAIRMAN DIXON: * * * [I]t should also be pointed out *that this Council has acted in this area of the Convention Center. It has acted in the area of the Convention Center. It took a stand and a position with community involvement. I think that, again, to go back and to open this up now through this process without full participation of other groups in the community in terms of the whole initiative, referendum, and recall process isn't appropriate at this time,* and this amendment would allow that to occur. [R. CA 8368–79 at 39, Pl.Ex.E at 34–35 (emphasis added).]

Councilmember John Ray pointed out the obvious discrepancy between Dixon's view and the purpose of the Charter Amendments:

MR. RAY: Mr. Chairman, I would just like to say, I think there is no better way to have full community participation than allowing the citizens to vote on the matter. I think I agree, the issue has been discussed a lot and I certainly have given it a lot of consideration. *I think that we all would have to admit that it has been handled in somewhat of a shoddy way.*

We talk about cost and what may happen, but suppose we got along to where we were half finished on the Convention Center in 1980 and it did go to referendum [sic] and the voters decided that [they] didn't want a Convention Center? Then, we would be in a fix.

It seems to me that we have sort of reached a point in this issue that the best way for all of us to go forward and have peace is to let the voters tell us whether they want this or not. And, I think there is no better way, no better way than to let the voters ... say "yea" or "nay."

I support the amendment, and I hope my colleagues will also vote for it. [R. CA 8368–79 at 39, Pl.Ex.E at 35–36 (emphasis added).] I think it is interesting to note that no one attempted to disabuse Councilmember Ray of his notion that the Charter Amendments would permit the voters to challenge the Convention Center even when it was half finished.

MS. MASON: Mr. Chairman, are you going to read your amendment into the record?

CHAIRMAN DIXON: Yes, it will be read into the record. The amendment reads as follows. [Dixon then read the text of his amendment.]

As I said, this is consistent with direction from the Corporation Counsel dealing with the budget process, and I would move it at this time. Is there discussion?

Several members of the Council immediately protested that the proposed amendment was inconsistent with the language and intent of the Charter Amendments. More importantly, however, is that when the opinion of the General Counsel of the Council was solicited, he considered it to be a substantive amendment and agreed with this conclusion:

MR. CHRISTIAN: In the opinion of the General Counsel, in my office, the legislation here, in effect, goes beyond that which would be normally included in the implementing piece and also, in effect, *constitutes substantively an amendment of the Charter amendment previously approved.*

MR. CLARKE: *You are saying*, then, that effectively *this constitutes a Charter amendment* and, therefore, this will have to go to referenda and to Congress as a Charter amendment?

MR. CHRISTIAN: Arguably—

MR. CLARKE: I'm asking your opinion.

MR. CHRISTIAN: *My opinion is that you are correct, Mr. Clarke.*

MR. CLARKE: So, *this is inappropriate for a normal bill*, it would be your opinion?

MR. CHRISTIAN: *You are correct.* [R. CA 8368–79 at 40, Pl.Ex.F at 15–16 (emphasis added).]

Nevertheless, Chairman Dixon ignored the advice of the Council's legislative counsel that the Dixon amendment conflicted with the Charter and was therefore invalid and ruled that the amendment was nonsubstantive, and therefore not subject to a third reading by the Council. Further discussion was prevented by the chair:

MR. CLARKE: Mr. Chairman, I call a point of order on your amendments.

CHAIRMAN DIXON: Mr. Clarke, we are opening discussions that have been dealing with a number of items in this bill before. The Council has already spoken its policy decision that we feel that we need to exercise our opinion as to what would be appropriate for this initiative language. There is, in fact, this initiative enabling legislation. Therefore, the Chair would argue that this particular item is not unlike other portions of the legislation, which does reflect policy statements of this Body, in fact, going forth legislatively with enabling legislation.

I would call for the question based on that.

All in favor, indicate by saying aye.

(A chorus of ayes.)

CHAIRMAN DIXON: Opposed?

(A chorus of nays.)

CHAIRMAN DIXON: The Chair rules that the motion carries.

MS. MASON: Division of the House.

CHAIRMAN DIXON: The Chair rules that the motion carries.

MS. MASON: Division of the House.

CHAIRMAN DIXON: If there is an appeal to the ruling of the Chair, then I would recognize that motion.

MS. MASON: I appeal, Mr. Chairman.

CHAIRMAN DIXON: The Chair has ruled that the motion carries. I have indicated that if there is an appeal to that, then that would be accepted to the ruling of the Chair that the motion carries. Then, we could have a division of the House.

MS. KANE: I request a division of the House.

CHAIRMAN DIXON: The division has been requested. The Chair will recognize the division. Would the Secretary, please, call the roll.

MS. ROBINSON: Councilmember Clarke.

MR. CLARKE: No.

MS. ROBINSON: Chairman Dixon.

CHAIRMAN DIXON: Yes.

MS. ROBINSON: Councilmember Hardy.

MS. HARDY: Yes.

MS. ROBINSON: Councilmember Kane.

MS. KANE: No.

MS. ROBINSON: Councilmember Mason.

MS. MASON: No.

MS. ROBINSON: Councilmember Moore.

REV. J. MOORE: Yes.

MS. ROBINSON: Councilmember Rolark.

MS. ROLARK: Yes.

MS. ROBINSON: Councilmember Shackleton.

MS. SHACKLETON: No.

MS. ROBINSON: Mr. Spaulding.

MR. SPAULDING: Yes.

MS. ROBINSON: Councilmember Wilson.

MR. WILSON: Yes.

MS. ROBINSON: Councilmember Winter.

MS. WINTER: Present.

CHAIRMAN DIXON: The motion carries. Now, I move the bill as amended.

MS. MASON: Mr. Chairman, personal privilege, please. *I would like to ask the Counsel a question to this matter.*

CHAIRMAN DIXON: *I think that is not an appropriate personal privilege comment, Ms. Mason.*

MS. MASON: I think this is appropriate. *I would like to ask the General Counsel, what is the authorizing legislation and powers in the District of Columbia to construct or operate the Convention Center?*

CHAIRMAN DIXON: *That is a substantive question, not a personal privilege question.*

MS. MASON: *Who is going to answer it for me?*

CHAIRMAN DIXON: *The question is out of order.*

MS. MASON: *It is out of order because you don't want it to get out to the public that we don't have a law to run it.*

CHAIRMAN DIXON: It is in the public now. It's not an appropriate question for personal privilege, Mrs. Winter.

MS. WINTER: Mr. Chairman, I voted "present." I wish we would get our amendment out prior to the Legislative Session. I have not seen it. My aide just brought the Charter to me. Mrs. Kane discussed the Charter, and I think we need an opportunity. I voted "present," because I didn't want to vote against something, and I don't know what I am doing.

CHAIRMAN DIXON: The bill is properly before us. All in favor, indicate by saying aye.

(A chorus of ayes.)

CHAIRMAN DIXON: Opposed? Abstentions?

The motion carries.

MR. CLARKE: *Mr. Chairman, I would like to ask your ruling on whether the amendment was substantive.*

CHAIRMAN DIXON: *It was moved as a conforming amendment to our understanding of the Charter, and it is not substantive. Mrs. Mason.*

MS. MASON: *Mr. Chairman, your attorney has ruled that that does change the Charter, so that means it is substantive, Mr. Chairman.*

CHAIRMAN DIXON: *The Chair has already ruled and the bill has been passed.* [R. CA 8368–79 at 40, Pl.Ex.F at 16–20 (emphasis added).]

This reveals how the Dixon Amendment was enacted. The Council was correctly forewarned by their counsel that it was an effort at a Charter Amendment and was therefore invalid. The amendment was pinpointed at the then-existing proposal for a voter initiative on the Convention Center project and the immediate purpose was to thwart it.[14]

14. *See* statement of Senator Leahy, *supra* at 921–922.

The Dixon Amendment bars any initiative that "would negate or limit [a budget request] act of the Council." The plurality concludes the Dixon Amendment is "congruent" with its interpretation of the Charter and, therefore, the Dixon Amendment is not invalid for failure to comport with the Charter Amendment exception.[15] This is not surprising, as the plurality—in a far-fetched interpretation—had previously construed the Charter exception to fit right into the terms of the Dixon Amendment, so as to validate the amendment.

As I have shown earlier, the Charter Amendment exception does not mean at all what the plurality has said. The Dixon Amendment is unmistakably an attempt to substantially amend the Charter and, consequently, is void by definition.

The plurality opinion says (at 915):

We hold that the Dixon Amendment ... prevents CCRC's initiative from reaching the ballot.

The plurality is there saying the Dixon Amendment is determinative of the issue. But if it had this much significance it would manifestly be an invalid Charter Amendment because it is beyond serious dispute that legislation may not amend a constitution (the Charter).

*Conclusion*

It would be most unfortunate if there were to develop a continuing pattern of governmental impairment of any vote by initiative or referendum that is governmentally considered an undesirable legislative proposal notwithstanding the Charter provisions enabling it.[16] At a Senate Hearing, the Chairman put this question to the Mayor:

Mr. Mayor, do you feel at all that *the series of steps in turning down the at-*tempt of some citizens groups under the *Home Rule Charter to have a convention referendum*, do you feel that might in any way be *going against the type of home rule that the citizens say they want?*

MR. BARRY: Mr. Chairman, *I don't think so .... I have made probably a 180–degree turn on this whole question of referendums....* [As] Mayor, and having the lack of restraint for full budgetary authority, I don't think we get the full weight of it .... As citizens go to referendums and turn these things down, *I don't think citizens of the Nation's Capital can stand that sort of pressure.*

MR. LEAHY: *Do you think citizens in the District of Columbia should have a right to a referendum on capital projects?*

MR. BARRY: *I don't think so,* which is a 180–degree change in my position. [*District of Columbia Appropriations for Fiscal Year 1980: Hearings before a Subcomm. of the Senate on Appropriations,* Pt. II, 96th Cong., 1st sess. 19 (1979) (emphasis added).]

The court majority is now assuming the role of effectively implementing the unfortunate purpose of the other two branches of government. It is small wonder that at a late stage the American Civil Liberties Union found its way into this case to warn against the impairment of voting rights that is now taking place. Just as we must protect "expression and association without regard to the ... truth, popularity, or social utility of the ideas and beliefs which are offered," *NAACP v. Button,* 371 U.S 415, 445, 83 S.Ct. 328, 344, 9 L.Ed.2d 405 (1963), so must the right to vote equally be protected no matter that there may be official apprehension as to the outcome.[17] The vitality of the government depends upon

---

**15.** A Council enactment concededly cannot repeal or substantially amend a Charter (constitutional) provision.

**16.** *See* editorial at note 3, *supra.*

**17.** In a similar context a local commentator recently had this to say:

The only argument .... is that D.C. Citizens shouldn't have the right to vote because of [what] they might vote for .... But that's an immoral argument, and everybody using it knows it is immoral to deny the franchise because of how it might be exercised. Besides, it is unconstitutional...." [Joseph L. Rauh, Jr., The D.C. Amendment Can Be Saved, The Washington Post, Aug. 22, 1980, § A, at 23.]

this. "Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964) (voting apportionment). Instead, we have today two opinions for the majority denying the right which defy acceptable translation into the real world of government.[18] This right does not—of all things—depend upon exquisite timing.

Only in bygone years has political expression by vote been subjected to so many prior restraints as those laid down here. The plurality opinion, in particular, is cleverly crafted so as to stop the voters at almost every turn, *as a practical matter*. I make the dire prediction that in the early future there will be a judicial effort to apply the plurality opinion so as to deny future attempts to exercise the voting initiative franchise on proposals considered "unpopular" in government circles.

The court and the bar will be years untangling this case. This is what happens when the judiciary forsakes its true role. I do not have the slightest hesitation in saying this decision diminishes the court.

I dissent.

## APPENDIX

*Legislative History*

As originally introduced by the late Councilmember Julius Hobson, the Charter Amendments bill contained a provision for the right to *referendum* which remained substantially unchanged through its final passage and approval by the electorate.

The initiative right, however, originally contained no exception for "laws appropriating funds." Section 101 of Bill 2–2 read simply:

The initiative is the power of the electors of the District of Columbia to propose legislation and refer such legislation directly to the electorate to pass or reject the same.

It was at the full Council's first reading of Bill 2–2 on April 5, 1977 that then Coucilmember Arrington Dixon first introduced the "laws appropriating funds" exception as an amendment to the bill's definition of initiative. Some of the concerns and misgivings which ultimately led to this amendment were first articulated, however, at a March 16, 1977 meeting of the Council's Government Operations Committee, chaired by member Dixon and called to consider and report the bill. Accordingly, before recounting the discussion immediately surrounding introduction of the amendment, I shall briefly describe the Committee's earlier deliberations.

## A. *D.C. Council Government Operations Committee Meeting of March 16, 1977*

After some initial extended discussion of matters not here material, then-Councilmember (now Mayor) Marion Barry broached the subject of the bill's treatment of the "fiscal implications" of an initiative. His clearly expressed concern was that the people might propose a project and the Charter would *require* the Council to find money for it in the budget or request further funds from Congress.[1] Bruce French,

---

**18.** Neither opinion has precedential authority. These two opinions follow different courses and agree only on a judgment of affirmance.

**1.**    MR. BARRY: Mr. Chairman, what happens if it happens—if the initiative has fiscal implications? Suppose that someone wants to draw up a bill which provides for the hiring of the unemployed or say two thousand of them or three thousand of them and it has a fiscal implication of four or $5 million? How is that handled in this bill?

I've been reading it and I can't figure out how the fiscal impact is handled, particularly, since the committees which would review the initiative are not the Appropriations Committee, but I assume it would be the House District Committee and the Senate District Committee.

How then would the fiscal process be handled? I mean, would the District government be compelled to spend $10 million or $5 million on a measure just as when we bring a bill to the floor of the Council we have to, at least, estimate what the fiscal impact will be or try to figure out what it will not be. Is that answered in this legislation? [R. CA 8368–79 at 37, Pl.Ex.B at 9010.]

the Committee Clerk and apparently the chief draftsman of the bill, responded that, consonant with the general structure of the Home Rule regime, an initiative could *authorize* but not *appropriate*, since the latter process is one ultimately resting with the Congress.[2] And in a subsequent exchange between then Councilmembers Barry and Hobson, the former reiterated his belief that the public ought to be made aware that while it could authorize a project by initiative, the inherent structure of Home Rule required that the funds for it be separately requested by the Council and appropriated by Congress.[3] Committee Chairman Dixon himself apparently joined in then Councilmember Barry's concern that the public somehow be informed that an initiative would not automatically trigger a flow of federal funds for the project proposed.[4]

Councilmember Barry did, however, express a separate concern with other fiscal implications of the bill later in the meeting. He spoke strongly in favor of the language in Councilmember Hobson's bill which would preclude referenda on such potentially unpopular matters as tax measures and bond issues for school renovation. Barry's view was that the proper running of government would become impossible if the people were permitted to challenge the very lifeblood of essential government programs in this way.

But Barry took care to state for the record that he was not "for excluding capital projects from referendum." [R. CA 8368–79 at 37, Pl.Ex.B at 25.] In moving that the bill as written be reported to the full Council, Barry reiterated:

\* \* \* Again I want to make it clear that my argument was not on the capital part

2. MR. FRENCH: Yes, to this extent, the act as a normal Council act would be used as an authorization act.

It seems to me there are some serious public education problems involved on this precise issue. But if there are no funds—in other words, it's not an appropriation act, obviously.

So if it's, just for example, the Latino Community Development Act of this committee recommended with a figure of $200,000 in it, when it got to the Hill, the Hill said, "Good Luck, because we're only going to get $50,000 in terms of the actual appropriation." That would be the same case here. In other words, this is just like the Council saying that we direct that all x, y and z be done. But there is not money to do it—x, y and z are not done.

The problem is that there are serious public education problems here because it seems to me in terms of—a proponent of an initiative measure may very well believe that the measure will, in fact, provide, kind of ipso facto, the funding for it. But that requires an appropriation act, which under the Charter requires a different process. [R. CA 8368–79 at 37, Pl.Ex.B at 10–11.]

3. MR. BARRY: Mr. Chairman, I'm for the initiative—you know, the bill here, but I want to make sure that persons who would initiate this situation, once it's passed, don't then think, automatically, if there is a fiscal impact, that there is money ready and then they blame us or somebody for not providing the money. I mean, I could be, for what they want.

MR. HOBSON: One thing about that, Marion, anybody providing an initiative or referendum, they write that in just like we do on the Council. In other words, they have to take into consideration the fiscal impact. And it becomes law just like if the City Council passes it.

MR. BARRY: I was just saying, with us, even if we put some money in a bill authorizing it, if it is not a part of the regular budget, then it just doesn't get funded. And I could give several examples.

And I just wanted to make sure we knew that there is another process which has to be followed. That doesn't mean that you can't eventually get the money, either through reprogramming or through it being included in the regular budget someway or another. But that was my concern. [R. CA 8368–79 at 37, Pl.Ex.B at 11.]

4. MR. DIXON: Plus, if you put a dollar impact on the referendum, the vote—the ballot, you're going to end up making people think they are tying into a money figure when they really aren't. It's still up to the Congress to appropriate and the Council to set aside.

I think it is going to require some rather sophisticated information out in the community. I think it's a useful piece in that regard, in that it would allow the electorate to become a lot more sophisticated, particularly if they use the vehicle in terms of what goes on—what goes on downtown and what goes on in the legislative process. [R. CA 8368–79 at 37, Pl.Ex.B at 12–13.]

of the budget. I think that the citizens ought to have a right to vote on these huge expenditures of money in that regard. But I do think that as we go forward we have to protect those institutions that sometimes cannot protect themselves. And certainly the public schools are one. If we put the referendum tomorrow for a $221 million budget for that school system, . . . I think we will get zero because that is the nature of where we are. [R. CA 8368–79 at 37, Pl.Ex.B at 26.]

The report issued by the Committee endorsed Barry's view, stating: "It was the Committee's intent that capital construction projects would be available to referendum." Committee on Government Operations of the District of Columbia Council, Committee Report No. 1, at 18 (March 16, 1977) R. CA 8368–79 at 38, Pl.Ex.C at 18.

In summary, two narrowly framed and clearly expressed concerns were made known during this first phase of Council consideration of the Charter Amendments bill. First, Councilmembers Barry and Dixon and Committee Clerk French stated that the electorate ought to be made aware that the proposed right of *initiative* included the *right to authorize* projects and programs, but not the separate and distinct *power to appropriate* funds for those projects and programs—a power not fully exercisable by even the District of Columbia Council itself under Home Rule. I would suggest that the clearest and most effective way to so inform the public would be to include in the language of the Charter provision itself an exception for "laws appropriating funds." If the legislative history had ended with the bare proposal of the exception, the necessary inference would be that it was intended to make explicit only that the initiative right did not include the right to request appropriations from the Congress.

Second, then-Councilmember Barry stressed the practical wisdom of not permitting referenda on emergency, tax, and general appropriation legislation, but emphasized that this bar ought not to extend to capital projects—an interpretation later adopted by the Committee Report. To be sure, it can be argued that the availability of referenda to challenge capital expenditures is nothing more than a recognition that capital appropriations are clearly not within the exception to the referendum right for "acts appropriating funds for the general operation budget." It is evident, however, that Barry's and the Report's statements regarding capital projects should be construed more broadly, as indicative of an implicit legislative intent that capital projects be subject to challenge via the *initiative* also. Several facts strongly support this interpretation. First, it is clear (as recognized by the plurality at n.38) that the initiative may be used, like the referendum, to repeal acts of the Council.[5] It follows—and there was at this point no indication otherwise—that the initiative could also be used to stop a capital project. Second, at this stage in the legislative history, the "laws appropriating funds" exception, whatever its significance, was absent from the definition of initiative. The right to initiative was, accordingly, subject to no special restrictions as to subject matter. It went without saying that the initiative, as well as the referendum, could be used against a capital project. Finally, it seems clear that when Councilmember Barry spoke in favor of barring referenda against tax and general appropriation statutes—but *not* referenda against capital projects—he intended his comments to apply to repealer initiatives as well.[6] That Barry explicitly focused on the "referendum" seems attrib-

---

5. The precise effects of a repealer initiative and a referendum are, of course, not the same. The mere proposal of a referendum measure acts to suspend the targeted act of the Council before implementation; if the Council action is disapproved by the electorate upon referral, it will never be enacted. An initiative, on the other hand, may repeal an already operable statute only from the time of approval of the initiative proposal. Where it is a capital project being attacked, however, the practical effects of the two modes of attack are the same: the project does not go forward. *See* discussion *infra*.

6. Notwithstanding Barry's comments, I think only a tortured reading would lead to a conclusion that the *initiative* may not be used to enact changes in tax and general appropriation stat-

utable to his use of that term—in this context at least—as encompassing all popular repealers. Thus, it seems abundantly clear that the firm sense of the Committee which first considered the Charter Amendments bill was that the people's right to vote a halt to capital projects was unencumbered by any language then in the bill.

### B. *District of Columbia Council Meeting of April 5, 1977*

It was at this, the Council's first reading of the Charter Amendments bill, that Councilmember Dixon proposed the addition of the "laws appropriating funds" exception to the definition of initiative. In introducing the amendment, Dixon stated, as the plurality notes, that the exception would "prohibit initiative[s] *used against* or as related to [7] appropriated funds which go to tax levying and other forms of operating budget or appropriated fund actions." (Plur.Op. at 911 (emphasis added).) What this indistinct comment actually meant is something only for speculation.

Councilmember Dixon was immediately asked by Councilmember William Spaulding to state again what the effect of the exception would be. R. CA 3868–79 at 132, Def.Ex. 1–1 at 19. Dixon answered:

It would not be used for taxes but only for appropriated—but not for tax purposes. You could not kill a tax measure with the initiative. You could, in fact, deal with the appropriation only. [R. CA 8368–79 at 134, Def.Ex. L–1 at 19.]

Perhaps sensing that he was not being fully responsive to Councilmember Spaulding's question, Dixon deferred to Bruce French, Committee Clerk, who explained:

This amendment provide[s] that you cannot *initiate or state appropriated measures* either for general operating Budgets or capital budgets. *It does not affect the tax measure at all.* This is because of the delay in the appropriation process. [R. CA 8368–79 at 132, Def.Ex. L–1 at 19 (emphasis added).]

While French, the apparent draftsman of the amendment, thus seems to have contradicted Dixon's assertion that the "laws appropriating funds" exception was intended to address the question of the use of the initiative against tax measures, his initial remark is to the effect that the exception was only intended to prohibit the electorate from *affirmatively requesting appropriations* via the initiative.

The correctness of this interpretation is borne out by the entire course of the subsequent discussion of the amendment. Councilmember Spaulding began the discussion by asking whether the exceptions to either the initiative or the referendum right were designed to prohibit popular measures with a "fiscal impact." It was Councilmember Dixon himself who responded that it was *not* the intent of the exceptions to proscribe initiatives or referenda with fiscal impact, noting that the people could, by initiative, authorize a capital project—a matter of obvious fiscal impact—just as the Council could.[8]

utes, subject matters expressly excepted only from the *referendum* right. This problem has been addressed by other jurisdictions, *see, e.g., State ex rel. Boyer v. Grady*, 201 Neb. 360, 269 N.W.2d 73 (1978) and cases cited therein, but is not before us today.

**7.** I question whether the plurality's emphasis at page 911 on the phrase "or as related to" in Dixon's statement, and the phrase "relating to" in District Delegate Fauntroy's statement, proves much of anything. It seems to me this language is as likely attributable to an unintentional imprecision as to the intentional description of the exception's "effect in broad terms" argued for by the plurality, *see* Plur. Op. at 911 and is of no significance. The relevance

of Delegate Fauntroy's total remarks is dubious inasmuch as he was not a member of the Council at any time here material and accordingly cannot be regarded as expressing legislative intent.

**8.** MR. SPAULDING: Question. Is this amendment intended to deal with the fiscal impact of a particular piece of legislation that is offered to referendum?

MR. DIXON: No, it is not.

MR. SPAULDING: Well then, at some point in the Bill do you address whether or not it can be a fiscal impact or whether that is a consideration or not under the provisions of the Legislation.

Spaulding then made clear his concern—later echoed by Councilmembers John A. Wilson and David Clarke—that the proposed Charter Amendments might permit an imbalance of the budget.[9] R. CA 8368–79 at 134, Def.Ex. L–1 at 21. Though there was some discussion of requiring those proposing an initiative measure to propose in addition a special tax levy to raise funds for the project or program proposed, the Council ultimately rejected this idea and opted to preserve the people's right, unfettered by prior fiscal constraints, to themselves authorize projects and programs.[10] Dixon noted, however, that two facets of the bill lessened the likelihood that the proposed Charter rights would lead to budget deficiencies. First, the exception to the refer-

endum right for tax acts proscribes popular challenge to the government's attempts to raise necessary revenue. R. CA 8368–79 at 132, Def.Ex. L–1 at 21. Second—and perhaps more significantly—the initiative right does not include the power to initiate the appropriations process: this power remains exclusively with the Mayor and the Council.[11] Thus, a final check on the budgetary effects of voter initiated legislation is retained by the District government, which must act separately to secure appropriations for programs or projects authorized by the people.[12] An exchange between Councilmembers Barry and Dixon highlighted this:

> MR. BARRY: * * * This Council can place legislation authorizing the establishment of entities. We established the

> MR. DIXON: It is possible, for example, that the initiative could put in place a structure or could cause an action by the government that would have fiscal impact, just like we as Councilmembers can introduce legislation to establish structures—[R. CA 8368–79 at 134, Def.Ex. L–1 at 20–21.]

9. Councilmember Wilson made clear that he was directly concerned with the requirements of the Anti-Deficiency Act, 31 U.S.C. § 665 (1976). See also D.C.Code 1978 Supp., § 47–228.

10. MR. CLARKE: * * * [I]s there any way to require that if there be a fiscal effect, because it appears there is capability for the public to force the expenditure by mandatory language, that they also have in it a piece which is revenue raising sufficient to meet the expenditure?
MR. DIXON: In the initiative they could, in fact, include—
MR. CLARKE: Is there any reason to require it?
MR. DIXON: This is consistent with the legislation all over the country. There is no neutral official that we can look to to make the determination of the cost of a measure.
MR. CLARKE: Is there any way the court could do it?
MR. DIXON: I am sure the court could, but there is no neutral official to make the determination as to what the cost of the measure would be prior to coming to the Council.
MR. CLARKE: May I proceed? If a bill was put through and it cost $1 million and a piece were put through to raise the sales tax by half a percent and it only raised $500—and then the city didn't do whatever the bill required to be used, couldn't that be a judicial issue in the court? Could the court be in

a process to determine the adequacy of the taxing portion of the bill that was passed?
MR. DIXON: The answer is yes. Just like they can do now. They can take us to the court now.
They [can] set up things that they don't have any money for. [R. CA 8368–79 at 134, Def.Ex. L–1 at 28–29.]

11. MR. TUCKER: * * * The question is really one of are there any limits—to what they might offer in terms of fiscal impact? If the electorate decides they thought their actions were such that they don't care what it cost and they so voted, then that becomes law.
MR. DIXON: It is the same process, Mr. Chairman. If we were to put in place a massive structure to establish an agency that was a massive structure and it would have had an impact on us fiscally, then we would have to fund this process and we would have to fund half the legislation we put in place during the normal taxation and funding process.
The community can do the same thing, if they felt they wanted a structure. They would set it in motion and put it in place. We would have to vote for tax and money for that. [R. CA 8369–79 at 134, Def.Ex. L–1 at 22–22.]

12. The Council recognized, however, that the exercise of its power to forestall the actual implementation of an initiative measure in this way would not be immune from popular challenge. The Council was sensitive to the possible political repercussions which a decision not to appropriate would have, for the Charter Amendments gave the electorate the right, not only to make law themselves, but to recall their elected lawmakers. [R. CA 8368–79 at 134; Def.Ex. L–1 at 32–33.]

Office of Latino Affairs. We have also put into our budgetary process that to put in that measure some $50,000.

My interpretation is that is authorizing legislation and it is not appropriat[ing] legislation. That is, *the Council in its budgetary process will decide to exclude the $5 million health center that the community had authorized us to build and operate, if during the budgetary process the Council voted against it.* That was my understanding in the Committee. That was my understanding from the staff, that authorizing legislation as we do but it wasn't appropriating legislation.

\* \* \* \* \* \*

MR. DIXON: It is correct on the initiative section. We passed it. *The electorate can initiate a tax if they want to, but they cannot appropriate that money. They can initiate any measure they want to initiate but they cannot initiate the spending of that money. That is not in their power to do.* \* \* \* [R. CA 8368–79 at 134, Def.Ex. L–1 at 24–25 (emphasis added).] [12]

The clear import of this discussion as the plurality concedes, is that "[t]he Council was particularly concerned ... that the electorate not use the initiative to *launch* the appropriations process." (Plur.Op. at 912 (emphasis added).) That is the plain meaning of the term and that is the sense of the legislative history. Normally, that should have ended the matter and there would have been agreement on a construction of the legislative history. But that would have led to a different result—the result now reached by the dissent in this case. But this was unacceptable for the plurality. Instead, the plurality decided to legislate its own way to the result desired.

* Denotes merits division.

** Associate Judge Harris did not participate in this matter.